# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2800

_____

United States of America

*Plaintiff - Appellee*

v.

Wesley Paul Coonce, Jr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Southern Division

_____

Submitted: January 15, 2019
Filed: July 25, 2019

_____

Before LOKEN, GRASZ, and STRAS, Circuit Judges.

_____

GRASZ, Circuit Judge.

Wesley Paul Coonce, Jr. appeals the district court's[1] judgment sentencing him to death for his role in the murder of Victor Castro-Rodriguez ("Castro"). We affirm.

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

# I. Background

Coonce and Castro were inmates in a locked ward that housed mental health patients at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("FMC Springfield"). Coonce was serving a life sentence for kidnapping and carjacking, while Castro was committed due to his mental health and had no projected release date.

Prison officials found Castro dead in his cell on January 26, 2010. The responding staff found Castro unconscious, with his hands tied behind his back with medical tape, feet bound at his ankles with shoelaces, and a brown cloth wrapped around his neck. Medical staff tried to resuscitate him to no avail. Dr. Carl Stacy, the government's expert pathologist, testified that Castro died from asphyxiation due to a compressed larynx. He opined that the strangulation occurred from a "larger object," not hands, because of blunt force trauma to the neck and the lack of any broken hyoid rings. He also noted blunt force trauma to the chin and injuries to the upper chest, lower neck, and back of the head. He estimated Castro died within three to five minutes.

Physical evidence supported the conclusion that Coonce and another inmate, Charles Hall, had killed Castro by standing on his neck. Both Coonce's right boot and Hall's shoes tested positive for a substance containing Castro's DNA. Coonce had two pairs of shoes in his cell that were missing their shoelaces. Coonce also showed Federal Bureau of Investigation ("FBI") Agent Rick McLain where he had placed his hand on the wall to balance while standing on Castro's neck.

A camera provided additional circumstantial evidence that Coonce and Hall killed Castro. The prison did not have cameras that could see inside Castro's cell or the door to his cell at the time of the murder. Nevertheless, a camera showed the only people that approached Castro's cell during the time of the murder were Coonce and

Hall. After a few minutes, Coonce left the cell for about a minute to talk to another inmate. He rejoined Hall in Castro's cell, and both of them were there for about nine additional minutes. Coonce left again, made a throat-slashing sign to another inmate and then returned to the cell. Both Coonce and Hall left the cell a couple minutes later.

Coonce repeatedly claimed responsibility for Castro's murder. His first admissions came shortly after FMC Springfield officials discovered Castro's body. He particularly described that he tied up Castro's hands and feet and stomped on Castro's neck. He explained Castro was a snitch. That same night, he told an investigating FBI agent that he kicked Castro in the neck and stood on his throat until he stopped breathing. Coonce also claimed both he and another person, which other evidence showed to be Hall, stood on Castro's neck until Castro stopped breathing. Coonce explained that interactions with other inmates had upset him and that he decided to retaliate against Castro for previously telling prison staff about a minor offense. The next day, he told a Bureau of Prisons ("BOP") psychologist that he killed a man and that it was by his choice. He told the FBI in a subsequent interview that he had no regrets about killing Castro. Coonce also bragged about the murder to inmates and admitted it in letters and calls to friends and family.

In July 2011, a grand jury indicted Coonce on one count of murder in the first degree within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1111 and 2, and one count of murder by a federal prisoner serving a life sentence, in violation of 18 U.S.C. § 1118. The indictment included special findings of the statutory factors under 18 U.S.C. § 3591 and aggravating factors under 18 U.S.C. § 3592(c) that made the charged offenses eligible for the death penalty.

Coonce filed a motion for a separate trial from co-defendant Hall. The district court denied the motion. It concluded that redacting statements with *Bruton*[2] risks and properly instructing the jury would resolve any potential prejudice.

During pre-trial disclosures, the government asked for discovery on Coonce's mental health evidence and for an *Atkins*[3] hearing on whether Coonce was "mentally retarded."[4] Coonce responded that "the defense will not be asserting Mr. Coonce is mentally retarded" and "no *Atkins* hearing is necessary."

After an eight-day trial in April and May of 2014, the jury found Coonce guilty on both counts in the indictment. The district court then retained the same jury for the capital sentencing proceeding, where the jury would decide whether to impose the death penalty.

The government alleged Coonce was eligible for the death penalty based on his crime satisfying the required mental state for the death penalty and based on his conduct satisfying eight aggravating factors.[5] Four of the aggravating factors were from the Federal Death Penalty Act of 1994 ("FDPA"): (1) causing death during the

---

[2]*Bruton v. United States*, 391 U.S. 123, 135–37 (1968) (concluding there is a Confrontation Clause violation when one co-defendant's prior statements implicate another co-defendant's guilt but the first co-defendant does not testify at trial).

[3]*Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding the Eighth Amendment bans imposition of the death penalty on the mentally retarded).

[4]We recognize the use of the term "mentally retarded" may be offensive to some. However, this terminology reflects the statutory language. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded.")

[5]The government withdrew reliance on a ninth factor before the start of the capital sentencing proceeding.

commission of another crime; (2) having two or more prior convictions for violent felonies; (3) committing murder "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse;" and (4) committing murder "after substantial planning and premeditation." 18 U.S.C. § 3592(c)(1), (c)(4), (c)(6), (c)(9). The other four aggravating factors were "non-statutory" as they are not listed in the FDPA: (1) future dangerousness, (2) conduct suggesting a grave indifference to human life, (3) lack of remorse about Castro's death, and (4) obstructing justice by retaliating against Castro for reporting misconduct.

Coonce alleged that thirty-three mitigating factors weighed against the death penalty being an appropriate punishment for him, twenty-six of which were submitted to the jury. The first ten of these factors focused extensively on his chaotic and abusive childhood. Two factors sought to rebut the government's factors. They alleged Coonce showed remorse for Castro's death and that he would have help from loving family and foster family relationships. Six factors focused on his mental state and on injuries that may have caused traumatic brain injuries. Three factors alleged he had a lesser role in the murder. One of these factors suggested he killed Castro out of a desire to escape abuse from other inmates due to the sexual offenses in his history. Another noted Coonce's repeated attempts at suicide. Two factors alleged he had improved in the two years prior to trial. Finally, one catch-all factor allowed the jury to acknowledge "other reasons that weigh against the imposition of a sentence of death for Defendant Coonce."

After hearing all of the penalty phase evidence, the jury unanimously decided the death penalty should be imposed on Coonce. They found the government proved all eight aggravating factors. The entire jury found one mitigating factor: "Defendant Coonce's childhood was marked by chaos, abuse (both physical and sexual), as well as neglect and abandonment." Individual jurors found other mitigating factors. Eleven jurors found "[t]he chaotic and abusive life that Defendant Coonce endured as a young child increased his risk for emotional and mental disturbances in his adult

life."   Eight jurors found "[d]efendant Coonce has suffered from mental and emotional impairments from a very young age."   One juror found "[d]efendant Coonce's mother, Linda Coonce, was addicted to illegal drugs and alcohol."   In light of those findings, all of the jurors weighed the aggravating factors against the mitigating factors and agreed the death penalty was appropriate.

The district court imposed the death penalty as determined by the jury. Coonce timely appealed.

## II.  Analysis

The FDPA requires this court to perform three tasks on review: (1) "address all substantive and procedural issues raised on appeal," (2) "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," and (3) assess "whether the evidence supports the special finding of the existence of an aggravating factor . . . under section 3592."   18 U.S.C. § 3595(c)(1).   The court may "not reverse or vacate a sentence of death on account of any error which can be harmless," and the government bears the burden of proving beyond a reasonable doubt that the error was harmless.  *Id.* § 3595(c)(2).

Coonce raises sixteen arguments on appeal. We address them in order.

### A.  Eligibility for the Death Penalty

Coonce first argues that he meets the "mentally retarded" exception to the FDPA and is not eligible for the death penalty.  The FDPA states "[a] sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).   "[C]linical definitions of mental retardation require not only [1] subaverage intellectual functioning, but also [2] significant limitations in adaptive skills . . . that [3] became manifest before age 18."  *Atkins v. Virginia*, 536 U.S. 304,

318 (2002). Both the Supreme Court and this court have repeatedly noted the consensus that mental retardation must, as a definitional matter, onset before age eighteen. *See, e.g.*, *id.*; *Ortiz v. United States*, 664 F.3d 1151, 1158 (8th Cir. 2011). Coonce conceded below, and concedes on appeal, that his intellectual deficits were onset at age twenty. Thus, his argument relies on changing the prevailing understanding of the statutory exception to encompass an age of onset after eighteen.

In response to the government's request for discovery of mental health evidence, Coonce stated he would not be asserting that he is "mentally retarded" and that no *Atkins* hearing was necessary. Then, on day fourteen of the capital sentencing proceeding, Coonce filed a motion requesting an order barring the government from seeking the death penalty, arguing that the Supreme Court's decision against a firm IQ score cutoff in *Hall v. Florida*, 134 S. Ct. 1986 (2014) also supported eliminating the firm age cutoff in the definition of intellectual disability. The motion conceded Coonce did not meet the medical community's definition of age of onset but argued for a fluid definition anyway.

We assume, without deciding, Coonce preserved his argument and we hold the age of onset requirement remains before the age of eighteen. Coonce's main argument to evade the precedent construing the FDPA is to assert that the age of onset requirement is not rigid or will change in the near future. This argument disregards "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (ellipses in original) (quoting *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)). Both the American Psychiatric Association ("APA") and the American Association on Intellectual and Developmental Disabilities ("AAIDD") agreed at the time Congress enacted the FDPA's "mentally retarded" exception that the impairment

must onset *by definition* before eighteen.[6]  Thus, as a matter of statutory construction, Coonce's argument is meritless.

Coonce cites two other sources to persuade us to interpret the FDPA as having his preferred age of onset requirement: the text of the Rehabilitation Act of 1973, and a rule promulgated by the Social Security Administration ("SSA").  We find neither persuasive.

The Rehabilitation Act evidence is unhelpful because it involves a policy context that compels no legal conclusion.  Coonce is correct that Congress amended the Rehabilitation Act of 1973 to expand eligibility for disability benefits from those with a disability onset before eighteen to those with a disability onset before twenty-two.  Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. 95-602, 92 Stat. 2955, 3004–05 (1978).  He does not explain how this policy choice defining eligibility for benefits for physical and mental disabilities constitutes a medical judgment about mental disability.  Because developmental disability is inherently a legal term, not a medical one, *see Tennessee*

---

[6]In fact, both the APA and the AAIDD agreed on this definition at the time the original "mentally retarded" exception was enacted, Anti-Drug Abuse Act of 1988, Pub. L. 100-690, 102 Stat 4181, 4390 (1988), and at the time the FDPA was enacted with the same exception.  *Compare* Am. Assn. on Mental Deficiency, Classification in Mental Retardation 1 (Grossman ed. 1983) (defining mental retardation as occurring during "the period of time between conception and the 18th birthday"), *and* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 36 (Third Ed. 1980) (defining "onset before the age of 18" as an "essential feature"), *with* Am. Ass'n on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 1 (9th ed. 1992) (defining mental retardation as occurring "before age 18"), *and* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 39 (Fourth Ed. 1994) ("The onset must occur before age 18 years."), *and* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 29 (Third Ed. Rev. 1987) (defining "onset before the age of 18" as an "essential feature").

*Prot. & Advocacy, Inc. v. Wells*, 371 F.3d 342, 349 n.5 (6th Cir. 2004), Congress could redefine the term when it wanted as a matter of policy. We see no indication in the FDPA that Congress intended to adopt its policy judgments in other areas in lieu of the definition that prevailed at the time, especially when it did not specify that same policy judgment here.

Coonce is correct that the Social Security Administration defines intellectual disability as onset before age twenty-two. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. The SSA's rule is unhelpful because it cites no basis at all for its definition. There is no discussion in the Federal Register of why that rule was adopted. *See* Federal Old-Age, Survivors, and Disability Insurance; Listing of Impairments—Mental Disorders, 50 Fed. Reg. 35038, 35049–50 (Aug. 28, 1985). Thirty-one years later, the SSA did posit a reason for its age of onset: that it obtained that definition from the American Psychological Association (as opposed to the American Psychiatric Association). *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66155 n.16 (Sept. 26, 2016). This explanation is implausible on its face because it cites a 1996 manual to justify a 1985 definition. *See id.*[7] This does not necessarily harm the SSA's rule because the agency could adopt a minority view with its rulemaking authority even when the APA and AAIDD do not agree. This does harm Coonce's argument, though, because this court does not promulgate administrative rules and because Coonce still lacks evidence of experts defining the age of onset as before age twenty-two at the time Congress adopted the FDPA. Neither this court nor any professional association or administrative body has been delegated the legislative authority to redefine a term adopted by Congress.

---

[7]A review of the underlying manual also shows that it was attempting to change the prevailing definition in 1996, further undermining any value it would offer to show the meaning of the term "mentally retarded" at the time Congress passed the FDPA. *See* Am. Psychological Ass'n, Manual of Diagnosis and Prof'l Practice in Mental Retardation 36–37 (John W. Jacobson and James A. Mulick, eds., 1996).

Coonce alternatively raises this argument as an Eighth Amendment challenge. He tells us about recent changes in the debate over defining disabilities, describing how the APA has recently changed its definition for the age of onset from before eighteen to "during the developmental period," defined as "during childhood or adolescence." In Coonce's view, this change leaves open the question of whether the APA still believes the developmental period is before eighteen. He also tells us about literature suggesting the AAIDD, which still defines the age of onset as before eighteen, will eventually shift to a more vague standard. Both of these arguments are predictions that medical experts will agree with Coonce's view in the future. Such evidence is not sufficient for us to divine any current Eighth Amendment limitation on the statute.[8]

Because we agree with the district court that the age of onset is eighteen, we affirm its decision not to hold an *Atkins* hearing and not to consider whether Coonce satisfies the other factors for intellectual disability, regardless of whether he waived his arguments here.

## B. Evidence Regarding Coonce's Refusal to Submit to IQ Testing

Coonce next argues that admitting evidence at trial of his refusal to submit to an IQ test violated his Fifth Amendment due process rights by analogizing to the right to remain silent recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966). It is true the magistrate judge at his initial appearance gave a *Miranda* warning. The refusal to take an IQ test occurred at a competency examination over a year later. There is no indication in the record the competency examination was still subject to the same *Miranda* protections. The doctor at the competency examination only generally advised Coonce that statements are not confidential and that Coonce was free not to tell anything he wanted kept confidential. This warning is closer to the officer's

---

[8]We find no merit to his Fifth Amendment claim on the same ground.

advice in *South Dakota v. Neville*, 459 U.S. 553 (1983), about declining a blood alcohol test than a full *Miranda* warning because it warns of consequences without giving any substantive protections. And Coonce does not cite any authority stating a competency examination *must* be under *Miranda* protections. Accordingly, we do not agree the district court committed any *Miranda* error here.

In conjunction with his *Miranda* argument, Coonce also argues there was prosecutorial misconduct in closing arguments when the government suggested that IQ testing is unreliable, by contrasting it to the reliability of a blood test. "To obtain reversal for prosecutorial misconduct [in capital sentencing closing arguments], a defendant must show the prosecutor's remarks were improper, and that such remarks prejudiced the defendant's rights in obtaining a fair trial." *United States v. Rodriguez*, 581 F.3d 775, 798 (8th Cir. 2009). The government's arguments about the unreliability of IQ testing may have been somewhat aggressive, as they suggested such testing is *never* very reliable by comparing it to the precision of a blood test. We see no basis to conclude their arguments crossed the line into misconduct.

## C. Jury Instruction on Brain Damage Mitigating Factor

Coonce next argues he was prejudiced by the denial of a requested jury instruction on his brain damage mitigating factor. He requested an instruction that said "if any of you find the factual existence of a mitigating factor you may not ignore that factor or give it zero weight." His argument and instruction both rely on the false premise that juries assess mitigating factors only *for factual accuracy* rather than *for value as a mitigator*. We are aware of no statute or case law that "require[s] a capital jury to give mitigating effect or weight to any particular evidence," and "[t]here is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence." *United States v. Paul*, 217 F.3d 989, 999–1000 (8th Cir. 2000). In *Paul*, the jury declined to find the mitigating factor that Paul's co-defendant received only a life

sentence even though that statement was factually true. *See id.* This court found it sufficient that the jurors were allowed to consider the evidence regarding his co-defendant's life sentence before several jurors declined to find the mitigating factor. *Id.* at 1000. In fact, this court has repeatedly said a jury may give mitigating evidence no weight as long as they actually considered it. *See Rodriguez*, 581 F.3d at 799; *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007). Coonce's argument is a form-over-function argument because his ultimate complaint is that he wanted the jury to write down what they found factually true before evaluating the weight. There is no reason to believe the jury would have weighed the factors any differently if they had recorded factual accuracy separately from weight. Thus, because the jury considered the relevant mitigating evidence, the district court did not err in refusing an instruction requiring factual findings.

Coonce's further argument that the government impermissibly minimized the value of his mental damage at closing is an attempt to expand existing case law banning a "nexus" requirement for mental damage mitigation. It is true that the government cannot argue the defendant needs to prove a nexus between the mitigating factors and the crime at issue. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 245–46 (2007). Here, the government conceded Coonce's mental damage from incidents earlier in his life but argued the damage should not be a mitigating factor because he may have been at fault in those incidents. This is not a nexus argument but rather an attempt to devalue the mitigating factor. Coonce tries to argue at a high level of generality that this was an invitation for the jury to screen out a mitigating factor. His argument relies on his minimization of the government's concession of mental damage and maximization of the government's argument about the lack of weight the jury should give mental damage when deciding whether the death penalty was proper. None of the precedent forbidding a nexus requirement forbids the argument that was made here. Because the government conceded mental damage, it was not precluded from making arguments about weight as long as it avoided the impermissible nexus arguments.

-12-

## D. Coonce's Incriminating Statements to Dr. Park Dietz

Coonce next argues he should not have been compelled to discuss the relevant crime during his examination by the government's psychiatrist, Dr. Park Dietz. The Fifth Amendment generally protects defendants against the government's use of compelled statements to a psychiatrist. *Kansas v. Cheever*, 571 U.S. 87, 93 (2013). When a defendant introduces psychiatric evidence for a mental-status defense, though, the prosecution may then present its own psychiatric evidence in rebuttal. *Id.* at 93–94. The Federal Rules of Criminal Procedure implement several protections to support the Fifth Amendment restrictions here. The rules limit the government from seeing any results or reports of its compelled examination until the defendant is found guilty and confirms his intent to offer expert evidence on his mental condition at sentencing. Fed. R. Crim. P. 12.2(c)(2). The rules also prohibit the government from using any statement made by the defendant in the course of the government's examination, or any opinion based on such a statement, unless the defendant has introduced evidence on that particular issue. *Id.* 12.2(c)(4). The rules even prohibit using fruits of any statement by the defendant unless in rebuttal. *See id.* These protections limit the admissibility, not the scope, of the interview.

The district court's order on the scope of the interview complied with Fed. R. Crim. P. 12.2. It permitted a recorded interview by counsel firewalled apart from the government. It also required advance notice before *any* portion of the interview was usable in court. Coonce also does not dispute that he put his mental state during the crime at issue. Thus, the district court's order properly addressed the permissive scope while delaying any ruling on admissibility.

Coonce's argument that his statements should not have been admitted is foreclosed by the doctrine of invited error. Coonce objected to allowing offense-specific questions during Dietz's examination of Coonce but did not object to admitting those answers into evidence. In fact, counsel represented they had agreed

-13-

on what the government could offer into evidence. When counsel affirmatively approves of an evidentiary ruling, the invited error doctrine generally estops any argument that the ruling was errant. *United States v. Jewell*, 614 F.3d 911, 920 (8th Cir. 2010). We are not persuaded by Coonce's argument that any objection would have been futile because the district court only ruled on the scope of the examination, not admissibility. Thus, we conclude any error in admitting the evidence was invited, and we will not reverse on that basis.

### E. Footprint Evidence and Forensic Blood Evidence

Coonce next argues that a police officer's testimony about whether a footprint on Castro's chest matched Coonce's footprint violated the Federal Rules of Evidence. Although the evidence was admitted at trial, Coonce is only appealing his capital sentencing proceeding, and those proceedings do not follow the rules of evidence. "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). We review a district court's decision to admit evidence during the sentencing hearing under an abuse of discretion standard. *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005). The footprint evidence had little prejudice because showing that Coonce stomped on Castro's chest would add almost nothing to satisfying the aggravating factors at issue beyond the other conduct already in the record. Thus, we affirm the district court's decision to admit this evidence during the capital sentencing proceeding.

Coonce's argument about admitting evidence that Castro's blood was on Coonce's shoe has little probative value to sentencing. The FBI's expert testified at trial that the initial presumptive test on Coonce's right boot and on Hall's right shoe found blood, while the confirmatory test on both was inconclusive. This evidence

-14-

appears relevant to guilt, but Coonce does not appeal his murder conviction. Coonce also does not cite any point of the sentencing proceeding where the evidence was referenced. Presuming the evidence was even used in the sentencing proceeding, we see no abuse of discretion in its admission of this guilt evidence because we do not believe its probative value was outweighed by the danger of unfair prejudice.

## F. Jury Instruction on Future Dangerousness

Coonce next argues the district court inappropriately summarized the government's evidence in its future dangerousness instruction. "[A] death penalty phase jury must have 'clear and objective standards that provide specific and detailed guidance.'" *United States v. Ortiz*, 315 F.3d 873, 903 (8th Cir. 2002) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990)). Coonce argues that stating the allegations supporting future dangerousness amounts to improper "marshaling the evidence," citing *United States v. Mundy*, 539 F.3d 154, 158–59 (2d Cir. 2008). Regardless of whether marshaling of evidence is generally proper, some summary of the allegations supporting future dangerousness is necessary in capital sentencing proceedings in order to prevent an open-ended inquiry on the jury's perception of future dangerousness rather than an inquiry on the government's evidence. *See Ortiz*, 315 F.3d at 903. We are also not convinced that the district court's vague references here, such as "a continuing pattern of violent conduct," amount to a summation of evidence rather than a summation of the bare allegations.

Coonce's further argument that the district court made a mistake in its deviation from the model instruction on future dangerousness is correct, but any error was not plain. "A district court has 'wide discretion' in formulating a jury instruction." *United States v. Frank*, 354 F.3d 910, 921 (8th Cir. 2004) (quoting *United States v. Darden*, 70 F.3d 1507, 1541 (8th Cir. 1995)). "If the instructions, taken as a whole, fairly and adequately submitted the issues to the jury, we will affirm." *Id.* (quoting *United States v. Lalley*, 257 F.3d 751, 755 (8th Cir. 2001)).

Because Coonce's only objection below was giving this instruction without his proposed additional instruction, he raises this particular objection for the first time on appeal. We review unpreserved errors for plain error. *Jones v. United States*, 527 U.S. 373, 388–89 (1999). Under plain error review, "relief is not warranted unless there has been (1) error, (2) that is plain, and (3) affects substantial rights." *Id.*

The district court gave the following instruction:

> The first non-statutory aggravating factor alleged by the Government for each count is that Defendant Coonce presents a future danger to others based upon the probability that Defendant Coonce would commit criminal acts of violence that would constitute a continuing threat to the lives and safety of others. Defendant Coonce has engaged in a continuing pattern of violent conduct, has threatened others with violence, has demonstrated lack of remorse, and/or has demonstrated a low rehabilitative potential.

Penalty Phase Jury Instrs., 17, ECF No. 807. The Eighth Circuit Model Jury Instructions relevantly state: "The [first] non-statutory factor alleged by the government is that . . . [The defendant] would be a danger in the future to the lives and safety of other persons, as evidenced by [describe pertinent facts]." Model Death Penalty Jury Instructions, Eighth Circuit, No. 12.08 (brackets in original).

The district court's deviation from the model instruction here is unfortunate, but not reversible error. The district court's edit changed a statement of the government's allegation into an apparent statement of fact, replacing the phrase "as evidenced by" with a sentence break. By removing "as evidenced by," the instruction read in isolation could imply that the jury should assume it was proven Coonce had engaged in a pattern of violent and threatening conduct. In context, though, a reasonable juror could still infer that the second sentence was part of the government's allegations, especially since the instructions otherwise fairly reflected

-16-

that it was the government's burden to establish the aggravating factors. The paragraph preceding this disputed instruction even describes the subsequent paragraphs as the government's allegations. Thus, while the district court's edit is not a best practice for jury instructions, we cannot say it amounts to a plain error in context.

Giving this aggravating-factor instruction without Coonce's proposed mitigating-factor instruction was also within the district court's discretion. Coonce proposed a jury instruction that said, as a mitigating factor, that "[t]he Federal Bureau of Prisons is capable of imposing conditions of confinement that will control Wesley's future behavior." The district court admitted evidence about whether the BOP could control Coonce, but did not instruct the jury on how to handle that evidence. Nonetheless, we do not find its decision to be an abuse of discretion because Coonce was entitled to rebut allegations of future dangerousness in prison. *See United States v. Johnson*, 223 F.3d 665, 674 (7th Cir. 2000). The district court need not — and should not — instruct juries that sufficient control in prison is a mitigating factor. We are not certain this evidence is individualized enough to qualify as a mitigating factor because some BOP evidence is common to many BOP defendants. *See Zant v. Stephens*, 462 U.S. 862, 878–79 (1983) (requiring an individualized determination). Also, as our sister circuit has observed, allowing control in prison as a mitigating factor is illogical because it results in *rewarding* the most dangerous defendants for their dangerousness simply because they (unlike less dangerous defendants) would be placed in maximum security. *See Johnson*, 223 F.3d at 674–75. The district court correctly exercised its discretion when it refused to instruct the jury that Coonce's rebuttal evidence was a mitigating factor.

## G. Admitting BOP Administration and Costs for Future Dangerousness

Coonce next argues the district court erred by admitting evidence of the BOP's administrative policies and costs as part of the government's case on future

dangerousness. Our review is once again for an abuse of discretion. *Purkey*, 428 F.3d at 756. In support of his appeal, Coonce cites a Fourth Circuit case that undermines most of his argument. The Fourth Circuit expressed that it was troubled by remarks from the government during a death penalty hearing that the BOP could not adequately control the defendant. *United States v. Caro*, 597 F.3d 608, 626 (4th Cir. 2010). The Fourth Circuit found no reversible error for four reasons: (1) the challenged "comments about the jury's role were isolated and not extensive," (2) the defendant invited the argument by presenting evidence about how the BOP would control him, (3) the district court's instructions about individualized judgment and about attorney arguments not being evidence "counterbalanced any improper comments" during the argument, and (4) the non-statutory aggravating factors (and future dangerousness in particular) were otherwise well-supported by the record. *Id.* We think the Fourth Circuit's analysis applies equally well in this case. Coonce introduced evidence about whether the BOP could control him, inviting rebuttal. The district court also gave the same standard instructions as the court in *Caro*. The future dangerousness factor was also well-supported by evidence of numerous assaults in Coonce's past. Thus, because we agree with the analysis in *Caro*, we conclude Coonce did not suffer prejudicial error.

The one novel issue faced here but not in *Caro* is whether the government permissibly used Coonce's mental illness to show the BOP could not control him. The Supreme Court has suggested that mental illness cannot be used against a defendant as an aggravating factor. *See Zant*, 462 U.S. at 885. The government's argument shows the problem it was facing here: mental illness questions and evidence were needed to rebut some of Coonce's evidence. For example, mental illness could make Coonce ineligible for certain programs and placements his experts said would control him in the BOP. As another example, Coonce's expert, Stacey Wood, testified about how Coonce's brain injuries might mitigate his role in the offense, but she has previously written articles admitting the same injuries could also make him "increasingly aggressive, agitated, and dangerous." Coonce is correct that the

-18-

government's use of mental health evidence could imply future dangerousness, but the government is also correct that it only used mental health in cross-examinations and rebuttals to counter Coonce's evidence. We cannot see how the district court erred in admitting this evidence because the government did not advance mental health issues as an aggravating factor in its case in chief, and excluding such evidence here risked barring any fair rebuttal. Thus, we affirm the district court's evidentiary ruling on mental health rebuttal evidence.

## H. Right to be Present

Coonce next argues that his court-imposed absence during certain instructions to the jury violated his right to be present. Under the Federal Rules of Criminal Procedure, "the defendant must be present at . . . every trial stage." Fed. R. Crim. P. 43. The Fifth and Sixth Amendments also protect that right, but Rule 43 incorporates the most expansive common law understanding of the right, making it broader than the constitutional right. *United States v. Martin*, 777 F.3d 984, 990 (8th Cir. 2015). "[C]ommunications between judge and jury in the absence of the defendant *and his counsel* are presumptively prejudicial." *United States v. Koskela*, 86 F.3d 122, 125 (8th Cir. 1996) (emphasis added).

The issue in this case arises from the district court's removal of the defendants before instructing the jury on protestors outside the courthouse and on confidentiality of juror information. At the beginning of the day, the district court told counsel it was sealing the names of the jurors and that the defendants were not allowed to write down the names of the jurors. It also told counsel it intended to tell the jury about the protestors and allow them the option of staying inside and having lunch delivered during the break from trial. It stated the defendants would not be present for that discussion, and Coonce's counsel objected. At the lunch break, the district court had the jury exit solely so the marshals could remove the defendants. It had the jury immediately return. Then, it told them about the protesters and the precautions the

district court was taking, adding it was sealing the jury's names and addresses to protect them. The district court then recessed for lunch.

We conclude this discussion with the jury was a ministerial act and not a "trial stage" for purposes of Fed. R. Crim. P. 43. The discussion with the jury and counsel without the defendants was proper for seeking honest answers from the jury about any safety concerns they had. Regardless of whether a significant protest actually occurred, the district court is entitled to ensure its jury is free from external pressures. There is also no presumption of prejudice from excluding defendants from ministerial acts, especially when counsel remains present. Accordingly, we see no error here.

## I. BOP Records of Coonce's Misconduct

Coonce next argues the admission of his BOP records violated the Confrontation Clause of the United States Constitution's Sixth Amendment.[9] This court reviews Confrontation Clause objections to the admission of evidence de novo. *United States v. Dale*, 614 F.3d 942, 955 (8th Cir. 2010). This court has previously held "the confrontation clause does not apply in sentencing proceedings" but left open the question of whether it applies in capital sentencing proceedings. *See Johnson*, 495 F.3d at 976 n.23 (quoting *United States v. Wallace*, 408 F.3d 1046, 1048 (8th Cir. 2005)). Numerous circuits have found that the Confrontation Clause does not apply in capital sentencing proceedings, citing the Supreme Court's decision in *Williams v. New York*, 337 U.S. 241 (1949). *See, e.g.*, *United States v. Umana*, 750 F.3d 320, 346 (4th Cir. 2014); *United States v. Fields*, 483 F.3d 313, 327–28 (5th Cir. 2007).

---

[9]"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

While Coonce advances arguments about whether *Williams* is still good law, it is not our role to decide the continuing validity of a Supreme Court decision even if it appears suspect. As the Supreme Court has stated, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). *Williams* did address the scope of the Confrontation Clause in capital sentencing proceedings, and the case provides useful guidance to this court. *See Williams*, 337 U.S. at 250–52. This court en banc has also previously applied *Williams* as controlling on confrontation rights in non-capital sentencing proceedings. *See United States v. Wise*, 976 F.2d 393, 398 & n.2 (8th Cir. 1992) (en banc). The district court was as bound by *Williams* as we are.

Coonce's related argument that the BOP records were too unreliable to admit is also unpersuasive. Neither party cites a case from this circuit stating that the "indicia of reliability" standard for typical sentencing proceedings also applies to capital sentencing proceedings, although the Fifth Circuit has said as much. *See Fields*, 483 F.3d at 337–38. We see no reason to depart from that standard in capital sentencing proceedings either. Accordingly, we review the decision this evidence had sufficient indicia of reliability for abuse of discretion. *Purkey*, 428 F.3d at 756.

Coonce does not explain why the BOP's adversarial administrative process would lack indicia of reliability, and it appears his challenge is to unadjudicated conduct in BOP reports. In particular, he points to a report where a prisoner alleged Coonce attempted sexual assault when the adjudication only led to a conviction for punching that person. In the analogous situation of police reports, we have been suspicious of their reliability: "While police reports may be demonstrably reliable evidence of the fact that an arrest was made they are significantly less reliable evidence of whether the allegations of criminal conduct they contain are true."

-21-

*United States v. Johnson*, 710 F.3d 784, 789 (8th Cir. 2013) (quoting *United States v. Bell*, 785 F.2d 640, 644 (8th Cir. 1986)). We assess reliability "case-by-case." *Id.*

We are convinced the BOP reports were sufficiently reliable here for two reasons. First, the government also introduced the evidence showing that some of the charges did not lead to adjudications against Coonce. Second, any excessive charges from other inmates in the reports were consistent with Coonce's description of unreasonably hostile treatment by other inmates. Thus, we do not believe the district court abused its discretion in admitting BOP reports in this case.

## J. Using Coonce's Prior Offense for Multiple Aggravating Factors

Coonce next argues the government's repetitive use of his 2002 conviction for kidnapping and the related rape was unfairly prejudicial. However, he cites no authority barring this type of repetitive use. "Where the evidence is at most 'an extra helping of what the jury had heard before,' the evidence is merely cumulative and its admission does not result in reversible error." *United States v. Ramos-Caraballo*, 375 F.3d 797, 803 (8th Cir. 2004) (quoting *United States v. Simonelli*, 237 F.3d 19, 29 (1st Cir. 2001)). "There could be circumstances, however, where that 'extra helping' of evidence 'can be so prejudicial as to warrant a new trial.'" *Id.* at 804 (quoting same). *Ramos-Caraballo* was under the standard rules of evidence, not the FDPA, but we assess for unfair prejudice under either rule. 18 U.S.C. § 3593(c). We review for abuse of discretion. *Purkey*, 428 F.3d at 756.

As both parties acknowledge, the government used multiple witnesses to recount the kidnapping and rape in order to satisfy different aggravating factors. The only case Coonce cites where a court erred by admitting new but cumulative evidence was a Third Circuit case on child pornography. *See United States v. Cunningham*, 694 F.3d 372, 391 (3d Cir. 2012). The Third Circuit's analysis is not on point here because the Third Circuit was addressing a trial where the government introduced

multiple child pornography video clips to establish guilt of a child pornography offense. *See id.* The evidence at issue here is testimony, not video evidence, and it is being introduced to establish character for sentencing, not to bias a jury's determination on guilt. Coonce cites no case where we have ever required excluding cumulative evidence of past crimes in a capital sentencing proceeding, and we are not convinced that allowing multiple forms of evidence was unfairly prejudicial here. Thus, we conclude the district court did not abuse its discretion by admitting different versions of Coonce's prior kidnapping and rape offenses.

Coonce's other objection about using the same offense for multiple aggravating factors is foreclosed by precedent. We have stated there is no constitutional infirmity in duplicative factors because the jury weighs factors; it does not tally them for numbers. *See Purkey*, 428 F.3d at 762. As a result, the jury can account for the duplication in its weighing of the factors. *See id.* So, even assuming Coonce is correct that any of the factors were duplicative rather than merely similar, *Purkey* forecloses Coonce's argument for error based on duplication.

## K. Future Dangerousness as an Aggravating Factor

Coonce makes three primary arguments about why future dangerousness is not a valid aggravating factor. First, he argues that a probability-based factor like future dangerousness is not capable of proof beyond a reasonable doubt. Second, he argues that future dangerousness for a person under a sentence of life imprisonment should be narrowed to future dangerousness *in prison*. Third, he argues that an unreliable prediction cannot impose unalterable consequences like the death penalty. This court reviews challenges to the validity of an aggravating factor de novo. *United States v. Allen*, 247 F.3d 741, 786 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002).

-23-

Coonce's first argument is foreclosed by precedent. As he concedes, a plurality opinion in *Jurek* states that probability-based factors are permissible. *See Jurek v. Texas*, 428 U.S. 262, 274–76 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also id.* at 278–79 (White, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.). The government argues that *Jurek* forecloses this challenge because this particular argument was presented to the court in *Jurek*. We see no explicit response to that argument in the plurality opinion in *Jurek*. Nevertheless, we agree the question is implicitly foreclosed by *Jurek*. If a probability-based factor is constitutionally permissible *in a criminal case*, as *Jurek* states, then such a factor necessarily must be provable *beyond a reasonable doubt*. Because *Jurek* prevents us from questioning the premise, it also prevents us from questioning the conclusion.

Coonce's second argument is an argument we have previously rejected. *See Allen*. 247 F.3d at 788–89, *vacated on other grounds*, 536 U.S. 953 (2002). In *Allen*, this court noted the possibility of escape and danger to other inmates and prison officials, and it also noted that the jury could appropriately assess the evidence of future dangerousness when it also knew the defendant was serving a life sentence without the possibility of parole. *See id.* Seven Supreme Court justices have similarly suggested a reversible error would exist with this factor only when the jury was prevented from learning that the defendant had no possibility of parole. *See Simmons v. South Carolina*, 512 U.S. 154, 166 n.5 (1994) (opinion of Blackmun, J., joined by Stevens, Souter, and Ginsburg, JJ.); *see also id.* at 178 (O'Connor, J., concurring in the judgment, joined by Rehnquist, C.J., and Kennedy, J.). Although we are not bound by *Allen* due to its being vacated, we see no reason the district court erred, as the jury in this case knew about Coonce's existing prison sentence when assessing his future dangerousness.

Coonce's third argument has a false premise. Under *Jurek*, the prediction of future dangerousness *is* reliable. *Jurek*, 428 U.S. at 275–76, 278–79. Coonce cites two cases about life sentences for juveniles to support his argument: *Montgomery v.*

*Louisiana*, 136 S. Ct. 718 (2016); and *Miller v. Alabama*, 567 U.S. 460 (2012). Neither of these cases says anything about appropriate considerations for *adult* offenders like Coonce. The opinion in *Montgomery* even distinguishes cases concerning factors making the death penalty more likely for a particular offender from factors imposing an unconstitutionally excessive penalty on a category of offenders. *Montgomery*, 136 S. Ct. at 735–36. Coonce's argument presumes his own conclusions about future dangerousness and is unsupported by the authority he cites. The district court did not err in submitting future dangerousness to the jury.

## L. Voir Dire on Bias

Coonce next argues that the district court improperly restricted voir dire on areas of bias that he claims were critical to his case. In particular, he argues the district court improperly restricted inquiry into (1) connections to officials at FMC Springfield, (2) sexual abuse, and (3) and attitudes toward mental health evidence and related expert testimony.

"The Sixth Amendment guarantees 'the criminally accused a fair trial by a panel of impartial, indifferent jurors.'" *Ortiz*, 315 F.3d at 888 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). Voir dire helps protect this right. *Id.* Similarly, in a death penalty case, due process entitles a defendant to an impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 729–32 (1992).[10] "Trial judges have broad discretion in determining how best to conduct voir dire, though this discretion is not without boundaries." *Ortiz*, 315 F.3d at 888. While we have supervisory power in federal death penalty cases that extends beyond enforcing constitutional limits, *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991), we will reverse only for abuse of discretion

---

[10] *Morgan* concerned the Due Process Clause of the Fourteenth Amendment, not the Fifth Amendment, but Coonce argues and the government does not contest that the same standard applies to death penalty cases under either clause.

-25-

"[b]ecause the trial judge is in the best position to analyze the demeanor and credibility of a venireman," *Ortiz*, 315 F.3d at 888.

The district court's inquiry regarding friends and relatives of jurors working at FMC Springfield was not an abuse of discretion. The government agreed to a modified version of the question Coonce wanted, and it is unclear why the district court rejected it. Several questions covered many related issues, though, as the district court asked about spouses or significant others who were correctional officers, asked about family or friends in the mental health and medical fields, and asked about whether the jurors had ever applied for a job with a governmental agency. There is some potential for gaps in the responses, such as friends or family other than spouses working as correctional officers, or family or friends working at FMC Springfield in an administrative capacity. Because the existing questions covered such a large potential swath of people working at FMC Springfield, though, we cannot say the failure to ask a more exacting question was an abuse of discretion.

The district court adequately inquired about juror attitudes regarding sexual abuse. Coonce argues the inquiries as to juror experience with crime were insufficient, citing a district court case where a juror did not respond to a general question about being a victim of crime because the juror did not perceive an *unreported* sexual assault as responsive to the question. *See United States v. Fell*, No. 2:01CR12, 2014 WL 3697810 at *6–7 (D. Vt., July 24, 2014). Regardless of whether that juror in *Fell* was an outlier or within the mainstream of jury understanding, a similar omission could not have occurred during voir dire in this case. The district court orally asked about attitudes toward possible evidence of the defendant's past rape or sexual assault. The district court also received responses on point from prospective jurors about personal knowledge of sexual abuse. Thus, Coonce could not show any potential prejudice even if he could demonstrate there was an error.

Finally, the district court adequately inquired regarding juror attitudes toward mental health issues. Coonce argues the district court should have asked prospective jurors more targeted questions about attitudes toward mental health *defenses*. He points to a Ninth Circuit case that references other authority stating that a defendant is entitled to voir dire about attitudes toward an insanity defense. *United States v. Jones*, 722 F.2d 528, 529–30 (9th Cir. 1983). No such defense was at issue here. Instead, Coonce claimed mental health issues as a mitigating factor in a death penalty hearing. The main mental health questions Coonce wanted in the questionnaire were asked at voir dire, and it was only the wording of some of the questions that changed in the final result. In particular, the district court asked potential jurors whether they or immediate family or close friends had experience with mental illness or mental impairment, and it asked whether they had any negative attitudes toward mental health professionals. We are not persuaded that all mental health evidence carries the same stigma as the insanity defense, and we believe these questions adequately inquired as to biases here. Thus, even if we were to agree with the Ninth Circuit on the insanity defense requiring a voir dire question, we would see no abuse of discretion in the district court's voir dire on mental health issues.

## M. Lack of Individualized Voir Dire

Coonce next argues the district court should have conducted individualized voir dire privately and away from other prospective jurors. The Supreme Court has once observed that the "psychological impact" of answering before other potential jurors can diminish candor. *Irvin*, 366 U.S. at 728. It has also observed that when discussing voir dire practices, "[t]he fact that a particular rule may be thought to be the 'better' view does not mean that it is incorporated into the Fourteenth Amendment." *Mu'Min*, 500 U.S. at 430–31. Without a constitutional violation here, which we do not find, Coonce's argument is only a request to use our supervisory power. Coonce cites no circuit court that has used its supervisory power to require district courts to conduct individualized voir dire. The record here also shows

multiple candid answers by potential jurors in the voir dire, suggesting that group voir dire was adequate in this case. Facing no constitutional violation or problematic record, we decline Coonce's invitation to adopt his perception of best practices for our district courts.

## N.  Separate Capital Sentencing Proceedings

Coonce next argues the district court abused its discretion by denying him a separate capital sentencing proceeding from Hall. In *Kansas v. Carr*, the Supreme Court reversed a decision of the Kansas Supreme Court finding that the Eighth Amendment required separate sentencing proceedings. 136 S. Ct. 633, 646 (2016). The Court emphasized: "[t]o forbid joinder in capital-sentencing proceedings would, perversely, increase the odds of 'wanto[n] and freakis[h]' imposition of death sentences." *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 206–207 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). Coonce suggests some factual distinctions, but none are a basis for disregarding the broad holding in *Carr*. He does not demonstrate possible prejudice from the jury failing to separately consider him and Hall or from instructions which commingled evidence and law not applicable to him with otherwise proper law and evidence. *See id.* at 645. The sentencing verdict forms also separately treated the two co-defendants. Thus, we see no error in the district court's refusal to sever the capital sentencing proceedings.

## O.  Standard for Weighing Factors

Coonce next argues that a jury must weigh factors in capital sentencing proceedings using a beyond a reasonable doubt standard. We have stated that the weighing component of the FDPA is not an elemental fact. *Purkey*, 428 F.3d at 750. *Purkey* only addressed whether a grand jury needed to charge the weighing component in an indictment, but our conclusion that weighing is not an element also

means that a capital sentencing jury does not need to perform the weighing beyond a reasonable doubt. The district court correctly followed our precedent.

## P. Arbitrariness Arguments

Coonce finally argues he was arbitrarily sentenced based on geography because the Western District of Missouri has more death penalty cases than the average district court. This argument is fundamentally a policy argument, not a legal one. The statute governing our review requires this court to assess whether "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(1). The implication in this statute is that the court must assess whether *the jury* decided the sentence should be imposed based on any of those factors. Coonce makes no attempt to argue the jury here sentenced him based on geography.

Even if the statute were not narrowed to the jury, Coonce makes no showing that he personally received a sentence of death based on geography. While he cites generalized statistics about other districts and defendants, he does not show that his *particular chance* of receiving the death penalty changed because of the district. He infers from those generalized statistics that his sentence is arbitrary. But even if we agreed with his inference, which we do not, it is equally plausible that his sentence is deserved but some other cases in the district involved arbitrary use of the death penalty. Coonce offers no basis to reach an inference in his favor aside from his presumption that imposition of the death penalty is always improper.

Coonce's alternative argument that the FDPA itself is arbitrary has no legal merit. This court has previously rejected the arguments he advances. *Allen*, 247 F.3d at 760–61, *vacated on other grounds*, 536 U.S. 953 (2002) (stating that "the FDPA adequately narrows the class of persons eligible for the death penalty and sufficiently channels a jury's sentencing discretion" and that "proportionality review is not

required in order for the FDPA to pass constitutional muster"). Even if we reconsidered that view, Coonce makes no showing that he personally received a sentence of death based on some arbitrariness inherent in the FDPA. This alternative argument is nothing more than a list of grievances about the FDPA with no causal connection to Coonce's case.

## III. Conclusion

After addressing each of Coonce's arguments on appeal, we are satisfied that the district court's rulings on voir dire, jury instructions, evidence, presence of the defendant, and the aggravating and mitigating factors were correct. We also hold that Coonce does not satisfy the age of onset requirement for the "mentally retarded" exception to the death penalty.

Our other review tasks under the FDPA show no reason for reversal here. We found no merit to Coonce's constitutional challenge to the FDPA and see no other indication that passion, prejudice, or any other arbitrary factor resulted in his death sentence. *See* 18 U.S.C. § 3595(c)(1). In addition, our review of the record shows sufficient evidence to find a statutory aggravating factor. *See id.* Accordingly, we affirm the judgment of the district court.

_____