# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 12, 2021

Lyle W. Cayce
Clerk

No. 18-40598

United States of America,

*Plaintiff—Appellee*,

*versus*

Ricky Allen Fackrell; Christopher Emory Cramer,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:16-CR-26

Before Stewart, Duncan, and Wilson, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

We withdraw our prior opinion in *United States v. Fackrell*, ---F.3d---, No. 18-40598, 2021 WL 926905 (5th Cir. Mar. 11, 2021). The following opinion is substituted therefor.

Defendants Ricky Fackrell and Christopher Cramer were convicted and sentenced to death for the prison murder of Leo Johns, a fellow inmate. They appeal their convictions and sentences on numerous grounds. We AFFIRM.

No. 18-40598

## I. FACTS AND PROCEDURAL HISTORY

Ricky Allen Fackrell and Christopher Cramer were imprisoned at USP Beaumont. Both were convicted of the June 2014 prison murder of Leo Johns. Fackrell was a lieutenant in the Soldiers of Aryan Culture ("SAC"), a prison gang whose members abstained from drinking, drugs, and gambling. Members were recruited based on their beliefs in white supremacy and paganism. Cramer was a general in the SAC, and Johns was a member.

### 1. Fackrell

Fackrell has several previous convictions, including convictions for aggravated assault, robbery, and possession of a prohibited object. His prison record denotes several instances of misconduct including fights and property damage. He was also charged with the murder of a second inmate three months after Johns's death.

As to Johns's murder, Fackrell argued that he and Cramer only agreed to assault Johns. Johns had been drinking and gambling in violation of SAC rules, and Cramer determined that he needed to be punished. Fackrell and Cramer stabbed Johns with shanks in an inmate's cell. Fackrell argues that he stabbed Johns but left the cell before he died and that Cramer "finished Johns off."

At trial, Fackrell's defense was that he neither intended to kill nor killed Johns. Instead, Fackrell argued that he was present while Cramer killed Johns, that Cramer ordered him to participate in the assault, and that they only planned to "touch up [Johns] a little bit." The jury rejected Fackrell's defense and found him guilty of first-degree murder.

During the penalty phase of trial, Fackrell's mitigating evidence centered on his childhood. His father was an alcoholic and his mother was often working to support the family. They frequently moved around, and

Fackrell was bullied and abused by his father and brothers. He began drinking, using drugs, and committing crimes with his family when he was between 10 and 14 years old.

Fackrell's other mitigating evidence centered on his mental health diagnoses and ability to be reformed in structured environments like that of USP Florence-ADMAX ("ADX"), a maximum-security prison in Florence, Colorado. Fackrell was sent to ADX to await trial for Johns's murder.

Though individual jurors found that Fackrell had proven some mitigating factors, the jury sentenced him to death.

### 2. Cramer

Christopher Cramer was Fackrell's co-defendant at trial and sentencing. He has prior convictions for bank robbery and use of a firearm in relation to a crime of violence. He also has committed several instances of prison misconduct including assaults on other inmates.

At trial, Cramer's defense to Johns's murder was that he only intended to assault Johns and did not intend to kill him. He argued that his previous visits to Johns's cell on the day of Johns's murder indicated that he lacked the intent to kill Johns. The jury rejected his argument and convicted him of first-degree murder.

At sentencing, Cramer's mitigating evidence focused on his dysfunctional childhood and his ability to be safely housed at ADX. Cramer had a difficult upbringing—his mother was a prostitute and a drug addict; his father was a pimp and a drug dealer. His family moved frequently and slept in cars and parks. Due to his parents' absence, Cramer had to care for his younger siblings. He stole food to feed them and "was his siblings' hero."

No. 18-40598

His other mitigation evidence centered on ADX's ability to safely house him if he was sentenced to life. He argued that he was unlikely to ever leave a maximum-security prison given the severity of his crimes.

Both Defendants were convicted of first-degree murder and sentenced to death. They now appeal their convictions and sentences.

## II. DISCUSSION

Fackrell and Cramer argue that the Government and the district court committed numerous errors at trial and at sentencing. We review each alleged error in turn.

### A. Severance

Prior to trial, Fackrell and Cramer moved to sever. Fackrell requested separate trials, while Cramer requested separate trials, separate penalty-phase presentations, and separate penalty-phase juries. Both argue that the district court erred by denying their motions to sever. We disagree.

We review the denial of a motion for severance for abuse of discretion. *United States v. Rocha*, 916 F.2d 219, 227 (5th Cir. 1990).

"Under Rule 14, '[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.'" *United States v. Snarr*, 704 F.3d 368, 396 (5th Cir. 2013) (alteration in original) (quoting FED. R. CRIM. P. 14).

Even if prejudice is shown, severance is not required. *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). The district court still has discretion to grant relief. *Id.* at 539. "Severance is proper 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or

innocence.'" *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007) (quoting *Zafiro*, 506 U.S. at 539).

### 1. Fackrell's severance arguments

Fackrell argues that the joint trial prejudiced his rights at the guilt phase because the Government introduced Cramer's statements that implicate Fackrell in Johns's murder. Cramer told his cellmate that Fackrell volunteered to go to Johns's cell, that Fackrell jumped Johns from behind, and that he and Fackrell killed Johns. The Government introduced the statements under Federal Rule of Evidence 801(d)(2)(A), and Fackrell argues that the statements were prejudicial, lacked reliability, and would not have been introduced against him if he were tried separately.

He also argues that the joint trial prejudiced him during the penalty phase because it allowed Defendants to be conflated, their mitigation cases to be compared, and Cramer's personality disorder and prison assault history to be introduced.

Fackrell's arguments are unpersuasive. Cramer's statements are not so prejudicial as to be an abuse of the trial court's discretion in admitting them. His statements were not given in a custodial context, voiding any suspicion of unreliability present in other cases. *See United States v. Ebron*, 683 F.3d 105, 133 (5th Cir. 2012). Furthermore, Cramer's statements likely could have been introduced against Fackrell even in a separate trial as a statement against interest under Federal Rule of Evidence 804(b)(3).

Rule 14 does not mandate severance in any case, including capital trials. *See* FED. R. CRIM. P. 14. The introduction of Cramer's previous offenses, mental health history, and mitigation case was not so prejudicial as to curtail the district court's discretion to deny severance. Ample evidence of each defendant's criminal histories and prison misconduct is in the record, and mere surplusage of this evidence does not compel severance. *See United*

*States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002) ("A spillover effect, by itself, is an insufficient predicate for a motion to sever."). Nor did the joint trial deny Defendants the right to individualized sentencing under *Lockett v. Ohio*, 438 U.S. 586 (1978). Any conflating of the Defendants or the evidence against each of them was remedied by the district court's instructions, and we "must presume that the jury heard, understood, and followed the district court's instructions." *United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002).

### 2. Cramer's severance arguments

Cramer's severance arguments mirror Fackrell's, mainly that he was prejudiced by evidence of Fackrell's prior convictions and prison misconduct. Those arguments fail under *Bieganowski* as well.

Notably, Cramer argues that he was prejudiced at sentencing when the Government introduced evidence of Fackrell's involvement in a second prison murder. After Fackrell was charged in Johns's murder, he was charged in the murder of another inmate, Ronald Griffith.[1] The jury heard that only three months after Johns's murder, Fackrell brutally stomped on Griffith's head and said that he "didn't really care that he stomped [Griffith] out."

While evidence of Fackrell's role in the Griffith murder was more shocking than evidence of other crimes and prison incidents, we cannot conclude that this evidence compels severance. The jury's similar findings on the Defendants' mitigating factors reflect the similarity between the Defendants' mitigating cases rather than any confusion by the jury. Nothing suggests that the jury failed to follow the district court's instructions and

---

[1] Griffith's murder will be further discussed *infra* Section G.

impermissibly considered the Griffith murder when evaluating Cramer's case for life.

We find no error in the district court's denial of Defendants' motions to sever and thus affirm.

### B. Mental States under 18 U.S.C. § 3591(a)(2)

After a defendant is convicted of a capital offense, the jury must determine whether the defendant had a requisite mental state under 18 U.S.C. § 3591(a)(2) before sentencing him to death. Fackrell and Cramer argue for the first time that the Government failed to prove that they had one of the requisite mental states when they killed Johns. We disagree.

Since Defendants failed to raise this issue at trial, review is for plain error. *United States v. Avants,* 367 F.3d 433, 443 (5th Cir. 2004). To establish plain error, Fackrell must prove that "(1) there was error, (2) the error was plain, (3) the error affected his 'substantial rights,' and (4) the error seriously affected 'the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Jones*, 489 F.3d 679, 681 (5th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 732–734 (1993)).

18 U.S.C. § 3591(a)(2)(A)–(D) lists four mental states. The Government must prove at least one mental state in § 3591(a)(2) beyond a reasonable doubt. It must prove that Defendants:

> (A) intentionally killed the victim;
>
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2)(A)–(D).

Fackrell argues that the Government did not prove that he had a requisite mental state when he participated in Johns's murder. He argues that the jury could not have concluded that he had one of the requisite mental states in § 3591(a)(2)(B)– (D) because they all require actions that *result* in the death of the victim. Because the coroner did not determine which blow was fatal, Fackrell argues that the jury could not have determined that he was the but-for cause of Johns's death. In his view, the jury convicted him of first-degree murder because he aided and abetted in Johns's murder, and this level of culpability does not demonstrate that he had a requisite mental state.

This argument fails because aiding and abetting liability does satisfy the requisite mental states in § 3591(a)(2)(C) and (D). *See United States v. Williams*, 610 F.3d 271, 287 (5th Cir. 2010); *United States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000) . Even if the jury convicted Fackrell on the basis of aiding and abetting in Johns's murder, that finding is a sufficient basis for concluding that he had the requisite mental states under § 3591(a)(2)(C) and (D). We thus cannot conclude that there was error, let alone plain error. We affirm.

### *C. Prosecutorial Misconduct in Statements*

Fackrell and Cramer challenge several statements made by the Government at trial. They jointly challenge the Government's statements about (1) future dangerousness and the jury's responsibility for Defendants' death sentences and (2) mitigation evidence, arguing that the statements violated their Fifth and Eighth Amendment rights. Fackrell also challenges

the Government's statements about getting justice for the victim and the lack of evidence of his intent to kill Johns.

*1. Joint Challenge of Statements on Future Danger and Jury Role in Sentencing*

Defendants jointly challenge the Government's statements on future dangerousness and the jury's responsibility for their death sentences. They argue that the Government committed misconduct by eliciting testimony from witnesses about their ability to be released from maximum-security prison and then arguing that Defendants were likely to pose future danger. They also argue that the Government erred by implying that an appellate court would review a sentence of death. We disagree.

a. Future Danger

During the penalty-phase of trial, both the Government and Defendants called experts on future dangerousness. Defendants called Dr. Gravette, and the Government called Dr. Berkebile. Both testified about several maximum-security inmates with no relation to this case, including David Hammer. Hammer was originally sentenced to death, a court vacated his death sentence, and he was sentenced to life in a maximum-security prison. Hammer then killed another inmate.

The Government's future dangerousness argument used the experts' testimony about Hammer and other inmates to suggest that even maximum-security prisons could not contain some inmates. The Government further suggested that Defendants could one day be released from maximum-security prison and pose further danger in a less secure prison environment.

Though the record is not clear as to whether Defendants objected to the statements, Defendants' arguments fail even when reviewed for abuse of discretion. *See Snarr*, 704 F.3d at 399.

The Federal Death Penalty Act permits the introduction of aggravating and mitigating evidence unless "its probative value is outweighed by the danger of creating unfair prejudice." 18 U.S.C. § 3593(c). Our court has made clear just how broad that evidentiary standard is, concluding that "[w]here the alternative to the death penalty is life imprisonment, the government 'is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff.'" *Snarr*, 704 F.3d at 394 (quoting *Simmons v. S. Carolina*, 512 U.S. 154, 165 n.5 (1994)). Defendants' arguments therefore fail.

b. Jury Responsibility

Defendants also argue that the testimony about Hammer's death sentence later being vacated allowed the jury to think it was not ultimately responsible for their death sentences.

Defendants failed to object to the testimony at trial, so review is for plain error. *See Avants*, 367 F.3d at 443.

The Government asked Dr. Gravette about David Hammer, and the testimony was as follows:

> Question from the Government: "And [Hammer] was originally given a death sentence, but for some legal reasons that sentence was later overturned. Am I right so far?"

> Answer from Dr. Gravette: "Yes ma'am."

This testimony came up again when the Government examined Dr. Berkebile and said Hammer "had received a death sentence [and] it was converted to life . . . ." Defendants argue that this testimony violated the Eighth Amendment by permitting the jury "to believe that the responsibility for

determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi,* 472 U.S. 320, 329 (1985).

This argument is incorrect because this case is distinguishable from *Caldwell.* In *Caldwell,* the Supreme Court vacated a death sentence after the prosecutor told the jury that their decision was not the final decision and that it would be reviewed by the Supreme Court. *Id.* at 325–26 (1985). Here, the Government's statements are substantially different from those requiring reversal in *Caldwell.* The Government's statements were not in error, let alone plain error. We affirm.

### 2. Joint Challenge to Mitigation Statements

Defendants challenge the Government's statements that referred to mitigating evidence as evidence mitigating against the crime committed, rather than as evidence mitigating against the imposition of the death penalty. After Defendants presented mitigating evidence related to their childhood traumas, the Government responded with,

> "Well, you may very well find that that's a true statement, that you find that the defense has proven that by a preponderance of the evidence. But does that mean that it mitigates against a sentence of death? Does that mean the fact that if things were different, then he wouldn't have committed the crime or he wouldn't have been in prison?"

Defendants did not object to this statement. The Government later asked whether evidence about Fackrell's father's drinking mitigated Johns's murder. Defendants objected to that statement, but their objections were overruled.

We review Defendants' evidentiary challenges for abuse of discretion. *See Ebron,* 683 F.3d at 133.

Though Defendants challenge the Government's statements linking mitigating evidence to evidence that makes the crime less severe, the statements do not warrant reversal. In *Boyde v. California*, the Supreme Court did not reverse on similar language—that the mitigating evidence did not make the defendant's crime any "less serious." 494 U.S. 370, 385–86 (1990). We find no error in the district court's denial of Defendants' motion.

Furthermore, any potential error is rendered harmless by both the Government and district court's curative measures. Though the Government made the mitigation statements described above, it also said that mitigation evidence "[is] not something that excuses or justifies the crime; but it does have to be something that mitigates the death penalty." Likewise, the district court's instructions included a similar definition of mitigating evidence that tracks our precedent. The Government has sufficiently demonstrated that any error is harmless beyond a reasonable doubt. *See* 18 U.S.C. § 3595(c)(2).

### 3. *Fackrell's Challenge to Statements about Justice and Intent to Kill*

Fackrell next points to the Government's statements urging the jury to convict him of first-degree murder to avoid "less justice," "half justice," or "no justice" for Johns. He then points to the Government's statement that "[t]here is really not any evidence to suggest that Fackrell didn't intend to kill Leo Johns."

Since Fackrell did not object to these statements, we review only for plain error. *See Avants,* 367 F.3d at 443.

To establish plain error, Fackrell must prove that "(1) there was error, (2) the error was plain, (3) the error affected his 'substantial rights,' and (4) the error seriously affected 'the fairness, integrity or public reputation of judicial proceedings.'" *Jones*, 489 F.3d at 681 (quoting *Olano*, 507 U.S. at 734).

No. 18-40598

Fackrell's argument that the statements were in plain error is unconvincing. Even assuming that the statements were error, we cannot conclude that the error was plain or affected his substantial rights. *See United States v. Rosenberger*, 502 F. App'x 389, 394–95 (5th Cir. 2012) ("[T]he references to . . . achieving justice for Rosenberger's victims fall well short of any realistic likelihood of prejudice.").

Fackrell also fails to demonstrate plain error in the Government's statements that there was no evidence that he did not intend to kill Johns. Though the Government's statement "could have been more artfully put," it is best understood as a summary of Fackrell's rebuttal evidence and therefore not in error. Moreover, any error stemming from these statements would not impact Fackrell's substantial rights. *See id*. at 395. Fackrell's argument fails, and we affirm the district court.

### D. Testimony of Two Bureau of Prisons Psychologists

Fackrell next argues that the rebuttal testimony of two Bureau of Prisons ("BOP") psychologists violated his rights.

He offered various forms of mitigating evidence related to his mental health. He presented the records of Dr. Clemmer,[2] a BOP psychologist from ADX who treated Fackrell after Johns's murder (but before trial). Dr. Clemmer's notes describe Fackrell's history of depression while at USP Beaumont and note that USP Beaumont staff failed to respond to Fackrell's requests for psychological help in February 2009, December 2014, and January 2015.

---

[2] Though Fackrell initially designated Dr. Clemmer as a testifying witness, he chose not to call her to testify. The Government initially objected to Fackrell's motion to enter her records as evidence, but the Government ultimately withdrew its objection.

Fackrell offered testimony and evidence from psychologist Matthew Mendel. Mendel testified that Fackrell's juvenile records showed that he attempted suicide and had a provisional diagnosis of major depressive disorder that went untreated. He also testified that Dr. Clemmer's notes indicated that her treatment was helping Fackrell and causing "profound changes" in his behavior.

Fackrell also offered testimony from Robert Johnson, who holds a doctoral degree in criminal justice. Robert Johnson testified that Fackrell was suicidal when he arrived at ADX but had received help from the ADX staff. He also testified that Fackrell told him that he hoped to get treatment for his mental health issues and move forward with his life.

To rebut Fackrell's mitigation evidence, the Government called Dr. Shara Johnson and Dr. Brown, two BOP psychologists who treated Fackrell while he was at USP-Beaumont. Fackrell argues that their testimony violated his Fifth Amendment right against self-incrimination, his Sixth Amendment right to counsel, and the psychotherapist-patient privilege.

*1. Right Against Self-Incrimination*

Fackrell first challenges the testimony of the BOP psychologists as violative of his Fifth Amendment protection against self-incrimination. We disagree.

Fackrell did not object to the testimony of Drs. Shara Johnson and Brown on the basis that they violated his Fifth Amendment right against self-incrimination. In fact, counsel expressly stated that "we're not objecting to the government calling a rebuttal witness to say they disagree with the diagnosis of whatever it is they are going to say." Though counsel objected

14

to the admission of Dr. Brown's notes[3] under the Sixth, Eighth, and Fourteenth Amendments, those objections do not preserve any error based on the Fifth Amendment right against self-incrimination. *See* FED. R. EVID. 103(a)(1)(B) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party, and if the ruling admits evidence . . . [the party must] timely object or move to strike; and state the specific ground . . . ."); *see also United States v. Seale*, 600 F.3d 473, 485–87 (5th Cir. 2010). Nor can we say that the unoffered objection was apparent from the context. *See id.*

Because no objection was made on this ground, review is for plain error. *Avants,* 367 F.3d at 443.

Dr. Shara Johnson treated Fackrell between January 2015 and August 2016, and she testified that he had "no significant mental health disorders." She also testified about his diagnosis of antisocial personality disorder and his corresponding "pervasive disregard for the rights of others, irritability, aggressiveness, lack of remorse, and impulsivity."

Dr. Brown treated Fackrell beginning in January 2016, and she testified that when she met Fackrell he had "no mental health history whatsoever." She also testified that Fackrell said "[his] childhood had nothing to do with Johns's murder" and that his previous prison conduct "was funny."

More than merely undermining his case for life, Fackrell argues that the use of his statements to the BOP psychologists violated his Fifth Amendment right against self-incrimination because he was not warned that his statements to the psychologists could be used against him at trial. *See*

---

[3] Counsel specifically objected to Dr. Brown's documentation of her encounters with Fackrell while he was housed at USP-Beaumont for Johns's murder trial.

*Estelle v. Smith*, 451 U.S. 454, 468 (1981) ("Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness."). Since he did not receive *Miranda*[4] warnings before he spoke to the doctors during his treatment, he concludes that the use of those statements violated his rights under the Fifth Amendment.

We disagree with Fackrell's argument that the Government violated his Fifth Amendment right by calling the BOP psychologists as rebuttal witnesses. Under *United States v. Hall*, the Government may use its own expert witnesses to rebut a defendant's experts when the defendant places his mental health at issue. 152 F.3d 381, 398 (5th Cir. 1988), *abrogated on other grounds by United States v. Martinez–Salazar*, 528 U.S. 304 (2000). "This rule rests upon the premise that '[i]t is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony.'" *Id.* (alteration in original) (quoting *Schneider v. Lynaugh*, 835 F.2d 570, 575 (5th Cir. 1988)).

This case is distinguishable from *Smith* because Fackrell put his mental health at issue by introducing evidence and testimony from Clemmer, Mendel, and Robert Johnson. *See Smith*, 451 U.S. at 472 ("[A] different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase."). Their testimony described his past and current struggles with depression, suicide, and other untreated diagnoses. Fackrell offered the evidence as mitigating evidence, and the Government was entitled to rebut that evidence using its own witnesses.

---

[4] 384 U.S. 436 (1966).

We find no Fifth Amendment error in the Government's use of rebuttal testimony from the BOP psychologists.

### 2. Right to Counsel

Like his Fifth Amendment *Miranda* argument, Fackrell argues that his Sixth Amendment right to counsel was violated because he did not have counsel when he spoke with the BOP psychologists.

Fackrell objected to the admission of evidence on the grounds of the Sixth Amendment right to counsel.

We review de novo Fackrell's objection to the testimony on the basis of the Sixth Amendment. *See United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1998).

Because the doctor's statements were used against Fackrell at trial, he compares his treatment to a pretrial government expert evaluation. Without counsel present (or a valid waiver of the right to counsel), he concludes that his rights were violated.

In *Powell v. Texas*, the Supreme Court explained that a defendant's Fifth Amendment right "precludes the state from subjecting him to a psychiatric examination concerning future dangerousness without first informing the defendant that he has a right to remain silent and that anything he says can be used against him at a sentencing proceeding." 492 U.S. 680, 681 (1989) (citing *Smith*, 451 U.S. at 461–69). The Court further explained that "the Sixth Amendment right to counsel precludes such an examination without first notifying counsel that 'the psychiatric examination [will] encompass the issue of their client's future dangerousness.'" *Id.* (alteration in original) (quoting *Smith*, 451 U.S. at 471).

The BOP psychologists served as rebuttal witnesses to Fackrell's own evidence about his mental health. Fackrell points to nothing that indicates

No. 18-40598

that the doctors' evaluations were carried out in order to assess his future dangerousness, as was the case in *Smith* and *Powell*. Instead, the doctors' examinations were routine and in keeping with their duty of care to all inmates. We can find no error and thus affirm the district court's denial of Fackrell's objection based on the Sixth Amendment.

### 3. Psychotherapist-Patient Privilege

Fackrell next argues that even if the BOP psychologists' testimony was permissible under the Fifth and Sixth Amendments, their testimony violated the common law psychotherapist-patient privilege. We disagree.

Though the application of the psychotherapist-patient privilege is a legal question, Fackrell did not raise this issue before the district court. We therefore review for plain error. *Avants,* 367 F.3d at 443.

The Supreme Court recognized the psychotherapist-patient privilege under Federal Rule of Evidence 501 in *Jaffee v. Redmond*. 518 U.S. 1, 8–10 (1996). The Court described the importance of the privilege in fostering trust and candor between psychotherapists and their patients. *Id.* at 10. The benefits of the privilege are great because "[t]he psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." *Id.* at 11. Even still, the Court noted that the privilege must give way in certain circumstances. *Id.* at 18 n.19.

Though the psychotherapist-patient privilege is an important feature of our legal system, we cannot conclude that the district court committed plain error in permitting the doctors' testimony.

First, it is not clear that the psychotherapist-patient privilege exists during the sentencing phase of federal capital trials. "Information is admissible regardless of its admissibility under the rules governing admission

No. 18-40598

of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Section 3593(c) thus favors admission of all evidence except that which creates the risk of unfair prejudice, confusing the issues, or misleading the jury.

The psychotherapist-patient privilege prevents the admission of communications between psychotherapists and patients, and the privilege applies where the Federal Rules of Evidence apply after *Jaffe* (notwithstanding cases where state law compels a different result). But without the parameters of the Federal Rules of Evidence, we cannot conclude that the privilege applies in the sentencing phase of capital trials. Without the privilege limiting the admission of the doctors' testimony, the evidence could only be excluded for one of the reasons listed in § 3593(c), and we cannot say that the district court plainly erred by permitting this testimony.

Second, even if we assume that the privilege applies (and that Fackrell did not waive the privilege), we cannot conclude that the district court's error was plain. A plain error is one that is "so clear or obvious that 'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it.'" *United States v. Narez–Garcia*, 819 F.3d 146, 151 (5th Cir. 2016) (quoting *United States v. Hope*, 545 F.3d 293, 295–96 (5th Cir. 2008)).

Fackrell's best argument for applying the psychotherapist-patient privilege comes from two cases from our sister circuits. The first is *Koch v. Cox*, 489 F.3d 384 (D.C. Cir. 2007). *Koch* says that the psychotherapist-patient privilege can be waived when the party claiming the privilege "relies upon the therapist's diagnoses or treatment in making or defending a case." *Id.* at 389. Here, Fackrell argues that he did not rely on Dr. Shara Johnson or Dr. Brown's treatment in making or defending his case. The two doctors

19

testified for the Government on rebuttal, so they did not aid him in making or defending his case.

Following *Koch*, the Second Circuit decided *In re Sims*, 534 F.3d 117 (2d Cir. 2008). The Second Circuit agreed with *Koch* in *Sims*, adding that "a party's psychotherapist-patient privilege is not overcome when his mental state is put in issue *only* by another party." *Id.* at 134 (emphasis added).

However, neither of those cases addresses Fackrell's argument. Fackrell's mental state was put in issue by his own trial strategy because his own experts testified about his mental health history. Even if that evidence is categorized as rebuttal evidence to the Government's evidence of aggravating factors, that argument is undercut by the fact that Fackrell offered mitigating factors related to his history of depression. The record supports the conclusion that Fackrell put his mental state at issue through his choice of expert witnesses and mitigating evidence submitted to the jury.

Though both *Koch* and *Sims* are merely persuasive authority, they offer some guidance. Fackrell's claim would likely fail under both *Koch* and *Sims*. He has not cited, nor have we found, support for his position that the Government could not rebut his mental health evidence with the testimony of the BOP psychologists when he put his mental health at issue. We thus affirm, concluding that the district court did not commit plain error under the psychotherapist-patient privilege by permitting the BOP psychologists to testify.

*E. Mental Health Rebuttal Witnesses*

Cramer challenges the Government's use of mental health rebuttal witnesses, arguing that the testimony violated Federal Rule of Criminal Procedure 12.2 and the Fifth and Sixth Amendments. We disagree.

Because Cramer did not object at trial, review is for plain error. *See United States v. Rice*, 607 F.3d 133, 138–39 (5th Cir. 2010).

Cramer presented mental health experts during the sentencing phase. The experts focused on his difficult childhood and the impact of that childhood on his development. The Government presented a rebuttal witness, Dr. Jill Hayes. The Government agreed to limit her testimony to only direct rebuttal of Cramer's experts and to exclude all mention of Johns's murder. However, Dr. Hayes testified about statements Cramer allegedly made that indicate his lack of remorse for his crimes.

Cramer argues that her testimony went beyond pure rebuttal and thus violated Rule 12.2 and his Fifth Amendment rights. Much like cross-examination is generally limited to the topics inquired about on direct examination, Cramer argues that her rebuttal should have been tied to his mitigation evidence—evidence of his childhood and resulting traumas. *See, e.g., Kansas v. Cheever*, 571 U.S. 87, 97 (2013) (limiting cross-examination to topics from direct examination).

He further argues that his Fifth Amendment right against self-incrimination was violated when Dr. Hayes testified about his statements without his permission. Likewise, he argues that her testimony violated Rule 12.2 by violating the reciprocity principle embedded in the rule that limits rebuttal to the topics raised by the defendant.

We can find no plain error in permitting Dr. Hayes's testimony. Her testimony gave a broad overview of Cramer's life and did not stray so far from the topics Cramer raised as to constitute plain error. Cramer offered testimony about his childhood and his present-day experiences, and Dr. Hayes's testimony was similarly broad. Her testimony about Cramer's reaction to Johns's murder is no broader than the testimony of Cramer's own

expert. We find no error either under the Fifth Amendment or under Rule 12.2 and thus affirm.

### F. Excluding Evidence of the Johns Family's Suit

The district court denied Defendants' request to introduce evidence from the Johns family's civil suit against a BOP warden. They argued that details of the suit were relevant to rebut the Government's evidence related to the victim-impact aggravator. We agree with the district court.

The Federal Death Penalty Act permits the introduction of aggravating and mitigating evidence unless "its probative value is outweighed by the danger of creating unfair prejudice." 18 U.S.C. § 3593(c). We review the district court's evidentiary rulings for abuse of discretion. *Snarr*, 704 F.3d at 399.

The Johns family sued a BOP warden, alleging that the BOP was liable for Johns's wrongful death. In the warden's answer urging the court to dismiss the suit, he said that Johns was primarily responsible for his death because he joined the SAC and defied the rules prohibiting drinking and gambling. In Defendants' trial, the Government argued that Johns was not responsible for his murder and that Defendants murdered him to maintain their reputations.

The district court did not err in excluding this evidence as irrelevant and likely to confuse the jury. The individual warden's response in a lawsuit does not equate to the BOP's own statement on Johns's culpability, as the BOP was not a party to the civil suit. The evidence is therefore not relevant and the relationship between the two cases is so attenuated as to risk confusing the jury. Defendants' argument therefore fails.

## *G. Excluding Evidence related to the Griffith Murder*

During the penalty phase of trial, the Government presented evidence of Fackrell's involvement in the murder of Ronald Griffith. Fackrell attempted to introduce evidence that the Government offered a plea deal to his co-defendant in the Griffith murder. The district court denied Fackrell's request to introduce the evidence. Fackrell argues that the exclusion was in error and was not harmless beyond a reasonable doubt. We disagree.

The district court's decision to exclude information is reviewed for abuse of discretion. *Snarr*, 704 F.3d at 399. If there was error, reversal is required unless the Government can show it was harmless beyond a reasonable doubt. *United States v. Jones*, 132 F.3d 232, 252 (5th Cir. 1998).

After Johns's murder, Fackrell was charged with the deadly assault of Ronald Griffith, a fellow inmate and alleged sex-offender. Fackrell allegedly participated in this assault with another inmate and SAC member, Erik Rekonen. In the prosecution for Griffith's murder, the Government agreed to a ten-year sentence for Rekonen but pursued the death penalty against Fackrell. The Government and Rekonen's attorney met about a potential plea in 2017. The record reflects that the Government sought to make a deal with Rekonen in exchange for his testimony against Fackrell.

The district court excluded the mention of Griffith's murder during the guilt phase of Johns's murder trial but permitted its mention during the sentencing phase. The Government presented Griffith's murder as aggravating evidence, and Fackrell argued that evidence of Rekonen's plea deal should have been permitted as mitigating evidence. Fackrell asserts that Rekonen's plea deal was relevant because it demonstrated that his equally culpable co-defendant would not receive the death penalty. *See* 18 U.S.C. § 3592(a)(4) ("In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including

. . . [whether] [a]nother defendant or defendants, equally culpable in the crime, will not be punished by death."). He also asserts that Rekonen's lesser sentence reflects the BOP's acknowledgment that prison politics force inmates to violently assault alleged sex-offenders.

Though excluding mitigating evidence may violate a capital defendant's right to due process, *Green v. Georgia*, 442 U.S. 95, 97 (1979), we cannot conclude that the district court's exclusion was in error. 18 U.S.C. § 3592(a)(4) allows defendants to put on mitigating evidence of their co-defendant's culpability—in trials for the related offense. Here, Fackrell can point to nothing in the statute nor case law that commands district courts to permit mitigating evidence about co-defendants from *other* trials. The statute refers to other defendants "in the crime," and we conclude that the crime referenced in the statute is the crime for which Fackrell faced the death penalty, Johns's murder. In doing so, we follow our sister circuit. *See United States v. Gabrion*, 719 F.3d 511, 524 (6th Cir. 2013) ("This factor does not measure the defendant's culpability itself, but instead considers—as a moral data point—whether that same level of culpability, for another participant in the *same* criminal event, was thought to warrant a sentence of death.") (emphasis added).

Evidence of Rekonen's plea could also have been admitted as "catch-all" mitigation evidence under 18 U.S.C. § 3592(a)(8). Any error in excluding this evidence is harmless given that the jury already saw videos of Griffith's assault and heard evidence of Fackrell's involvement. We cannot say that evidence of Rekonen's plea would have "diminish[ed] [his] culpability or otherwise mitigate against a sentence of death." *Id.*

Furthermore, jurors found several mitigating factors related to Griffith's murder even without the evidence of Rekonen's plea deal. Six jurors found it mitigating that officers placed Griffith near other inmates

knowing that he may be assaulted. Another six jurors found that Fackrell and other inmates had to play prison politics to stay safe. This further demonstrates that any perceived error would be harmless.

We affirm the district court's exclusion of evidence of Rekonen's plea deal related to Griffith's murder.

## H. Acquitted Conduct as Evidence of Future Dangerousness

Cramer challenges the Government's use of his role in a 2012 assault charge as evidence of future dangerousness. Cramer was ultimately acquitted of the 2012 assault, and he argues that the Government violated his Fifth Amendment protection against double jeopardy. We disagree.

Cramer did not object at trial. Review is for plain error. *Avants,* 367 F.3d at 443.

"[A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Dowling v. United States*, 493 U.S. 342, 349 (1990). "Extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt." *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998).

Under *Dowling* and *Vega*, the Government was permitted to introduce evidence of Cramer's conduct related to the 2012 assault for which he was acquitted. At trial for the 2012 assault, the Government could not prove that he committed the assault beyond a reasonable doubt. However, the Government was not required to prove the 2012 assault beyond a reasonable doubt to mention it at the punishment phase of this trial. *See id.*

Thus, there was no error in the Government's mention of Cramer's charge for the 2012 assault. We affirm.

No. 18-40598

## *I. Categorical Approach and Fackrell's Prior Convictions*

The Government alleged four statutory aggravators in its notice of intent to seek the death penalty against Fackrell, including the 18 U.S.C. § 3592(c)(2) aggravator for use of a firearm and the § 3592(c)(4) aggravator for inflicting death or serious bodily injury. Fackrell has previous federal convictions for brandishing a firearm during a crime of violence and possession of a prohibited object. He also has a state law conviction for aggravated assault.

The district court did not use the categorical approach in determining that his previous convictions fit within § 3592(c)(2) and (c)(4). Fackrell argues that the district court should have used the categorical approach to compare the elements of his prior convictions with the elements of the offenses described under §§ 3592(c)(2) and (c)(4). He argues that his convictions do not fall within the ambit of §§ 3592(c)(2) and (c)(4), and thus his sentence must be reversed. We disagree.

Since the district court's decision to reject the categorical approach was a legal conclusion, we review it de novo. *United States v. Jackson*, 549 F.3d 963, 969 (5th Cir 2008). The analysis is subject to harmless-error review as well. *See United States v. Torrez*, 869 F.3d 291, 313 (4th Cir. 2017).

Our circuit has not yet addressed whether the categorical approach is the appropriate analysis under the Federal Death Penalty Act. Both sides present persuasive arguments, but we need not answer the question to resolve this issue. Even if we assume that the categorical approach applies and thus the § 3592(c)(2) and (c)(4) aggravators were invalid, the sentence can be affirmed if it would have been imposed without the invalid aggravators. *Jones*, 132 F.3d at 251–52.

The Government argues (and Fackrell concedes) that his prior convictions were admissible at the selection phase as non-statutory

aggravators. Fackrell argues that the jury necessarily would have put more weight on statutory aggravators than non-statutory aggravators, such that reversal is warranted for re-sentencing. Nothing in our precedent compels such a result, so Fackrell's argument fails.

### J. Fackrell's Hobbs Act Claim

Fackrell also challenges the characterization of his Hobbs Act robbery conviction as a statutory aggravator under 18 U.S.C. § 3592(c). He argues that the district court erred by permitting the Government to use his conviction as a § 3592(c) aggravator after *United States v. Davis*, 139 S. Ct. 2319 (2019).

Fackrell preserved this argument at trial, and review is de novo. *United States v. Hebert*, 131 F.3d 514, 525 (5th Cir. 1997).

The § 3592(c) aggravator includes convictions for violent crimes, and Hobbs Act robbery is a violent crime. *United States v. Buck*, 847 F.3d 267, 275 (5th Cir. 2017). The Government listed Fackrell's Hobbs Act conviction as the basis for the aggravator given its characterization as a crime of violence. Fackrell argues that this characterization is erroneous after *Davis*, where the Supreme Court held that the residual clause in § 924(c)(3)(B) was unconstitutionally vague. 139 S. Ct. 2319, 2323 (2019). He also argues that his Hobbs Act conviction was not based on a use of force because it can be committed by threatening harm to an intangible economic interest.

Fackrell's first argument is foreclosed by our decision in *Buck*. Hobbs Act robbery is a crime of violence in this circuit and therefore qualifies as an aggravator under § 3592(c). *See Buck*, 847 F.3d at 275.

Fackrell's second argument also fails. Hobbs Act extortion may be accomplished without the use of force. *See United States v. Nadaline*, 471 F.2d 340, 344 (5th Cir. 1973). This says nothing of Hobbs Act robbery for which

No. 18-40598

Fackrell was charged, and we find no error in listing Fackrell's Hobbs Act robbery conviction as an aggravator under § 3592(c).

### K. Jury Instructions on Mitigating Evidence

Fackrell challenges the district court's penalty-phase jury instructions on mitigating evidence, arguing that the two-step instruction for finding mitigating factors violates 18 U.S.C. § 3593(d). We disagree.

Fackrell preserved his objections to the verdict form. This Court "review[s] a challenge to jury instructions for abuse of discretion, 'affording the trial court substantial latitude in describing the law to the jurors.'" *United States v. Ortiz-Mendez*, 634 F.3d 837, 839 (5th Cir. 2011) (quoting *United States v. Orji-Nwosu*, 549 F.3d 1005, 1008 (5th Cir. 2008)).

Section 3593(d) provides that "[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established . . . ." The district court's instruction told the jury that it could "find that the defendant has proved by a preponderance of the evidence the existence of [a mitigating] factor and that it is mitigating."

The district court's instruction requires jurors to find that a fact was proven and then find that the fact was mitigating. Fackrell argues that this instruction permitted the jury to disregard mitigating evidence because it could find that a fact was proven but then conclude that the fact was not mitigating.

Fackrell's argument is undercut by 18 U.S.C. § 3592(a), which requires jurors to consider "any mitigating factor." 18 U.S.C. § 3592(a). Whether jurors first evaluated whether Fackrell proved the existence of some facts and then determined they were mitigating or answered both questions at once, the court's instructions were proper. *See United States v. Mikhel*, 889

F.3d 1003, 1055 (9th Cir. 2018) ("[R]egardless of whether the jury found that the proffered mitigating factors were factually unsupported or that they simply did not justify a lesser sentence, the final result is the same.").

We affirm the district court's denial of Fackrell's objection to the jury instruction on mitigating factors.

*L. Marshalling the Evidence in Jury Instructions*

Defendants argue that the district court impermissibly "marshalled the evidence" on the jury instructions for future dangerousness. We disagree.

Defendants failed to object to the instructions on this basis at trial. Review is for plain error. *Avants,* 367 F.3d at 443.

The district court's oral and written jury instructions defined future dangerousness and listed several pieces of evidence that the Government offered as future dangerousness evidence. The instructions did not list any of the defense's evidence against future dangerousness.

Though once common, the practice of judges marshalling the evidence "has fallen into widespread disfavor." *United States v. Mundy*, 539 F.3d 154, 158 (2d Cir. 2008). Courts should refrain from commenting on the evidence at trial and should avoid one-sided summaries or comments. *See Quericia v. United States*, 289 U.S. 466, 470 (1933).

In *United States v. Coonce*, the Eighth Circuit rejected a defendant's claim that the district court had improperly summarized the evidence of future dangerousness in favor of the government. 932 F.3d 623, 637 (8th Cir. 2019). The pattern jury instructions language used "as evidenced by" to describe pertinent facts related to the aggravators, and the Eighth Circuit cautioned district courts against removing that language from the instruction. *Id*. at 638.

Here, the pattern instructions also included "as evidenced by" and summarized the evidence. Such language is meant to aid and focus the jurors' analysis on particular pieces of evidence rather than presenting them an open-ended question. *See id*. at 637.

We cannot conclude that the district court plainly erred by focusing the jury's analysis on particular pieces of evidence. In fact, the district court listed Defendants' own evidence of mitigating factors in its instructions as well, further proof that the court did not err by giving a one-sided summary of the evidence.

We affirm, finding no error in the district court's oral and written jury instructions.

### *M. Jury Question on Non-unanimity*

Defendants challenge the district court's supplemental jury instructions. They argue that the district court refused to instruct the jurors after they asked about the consequences of a non-unanimous verdict. We disagree.

Supplemental jury instructions are reviewed for abuse of discretion in light of the entire charge. *United States v. Hale*, 685 F.3d 522, 544–45 (5th Cir. 2012).

Prior to voir dire, Defendants requested a preemptive instruction on the consequence of a split verdict, but the court denied their requests under *Jones v. United States*. In *Jones*, the Supreme Court held that the Eighth Amendment does not require every jury to be told of the effect of non-unanimity. *See* 527 U.S. 373, 383 (1999).

Later during the sentencing jurors' deliberations, they sent a note to the court asking, "What is the process if we are not unanimous with our

verdict?" The district court sent a note back to the jurors instructing them to "[p]lease continue your deliberations."

"When evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." *United States v. Stevens*, 38 F.3d 167, 170 (5th Cir. 1994).

Defendants argue that even if the district court's initial refusal to instruct on non-unanimity was correct under *Jones*, *Jones* does not control where the jurors directly asked about non-unanimity. They argue that the district court's response should have been given in open court and should have answered the jurors' question.

We cannot conclude that the district court erred by responding to the jurors' question in writing. *See United States v. Strauch*, 987 F.2d 232, 242–43 (5th Cir. 1993). Nor can we conclude that the court abused its discretion by not providing a non-unanimity instruction in response to the jurors' question. Congress did not require such an instruction among the mandatory instructions that the district court must give. *See Jones*, 527 U.S. at 383 (citing 18 U.S.C. § 3593(f)).

Even beyond *Jones*, we can find no error where the district court's instructions explained that each juror must consider the evidence individually to render a verdict. The district court instructed the jurors that the verdict must represent the judgment of each of them and that they each must decide the case for themselves. The fact that many different groupings of jurors found various mitigating factors for Defendants further demonstrates that jurors acted individually.

We affirm the district court's supplemental jury instruction to the sentencing jury.

No. 18-40598

*N. Incomplete Record*

Defendants challenge the sufficiency of the record on appeal, arguing that missing components impair their ability to have a full appeal. We disagree.

The record on appeal includes transcripts of proceedings. FED. R. APP. P. 10(a). If the transcript of a hearing or trial is unavailable, Rule 10(c) permits the appellant to prepare part of that record from their recollection. FED. R. APP. P. 10(c). The district court did not permit Defendants to recollect parts of the record they contend are missing, and they argue that they do not have a substantial part of the record on appeal.

Where the defendant has new counsel on appeal, the court will reverse if (1) a missing portion of the record is substantial and significant, and (2) the trial court's reconstruction is not a substantially verbatim account. *See United States v. Pace*, 10 F.3d 1106, 1124–25 (5th Cir. 1993).

Defendants assert that the record is missing vital conferences, including the conference about the testimony of Elizabeth Rose, the Government's final witness in the guilt phase of trial. Rose was in a holding cell near Fackrell and Cramer's cells during their trial. She testified that she heard them making fun of the prosecutor's opening argument, laughing about stabbing Johns 74 times, and Fackrell saying that "[i]t didn't feel like that many [stabbings] when it was happening."

Rose was represented by an Assistant Federal Public Defender for the Eastern District of Texas, as was Cramer. She was facing a life sentence for conspiracy to possess and intent to distribute methamphetamine. She contacted her attorney and told him that she wanted him to tell the Government about what she heard. Rose's attorney petitioned to withdraw from her case given the conflict of interest created by her desire to testify against Cramer. Defendants' counsel believes that the court discussed

Rose's testimony in an unrecorded conference in chambers and that the missing record prejudices their defense. Counsel also believes that the parties discussed the potential conflict of interest facing the Federal Public Defender.

Defendants also identify the conference about the penalty-phase jury charge as another important proceeding that was unrecorded. The district court indicated that it wanted to meet with the parties to decide on the penalty-phase instructions. No recording of the conference exists. Several of counsel's proposed mitigating instructions did not appear in the instructions, and Defendants now argue that the court ruled on their proposed instructions at the unrecorded conference.

Defendants arguments fail because the discussion of Rose's testimony was not a "hearing or trial" within the meaning of Rule 10. Nor was the jury charge conference a "session of the court" pursuant to the Court Reporter's Act because it did not occur in open court. *United States v. Jenkins*, 442 F.2d 429, 438 (5th Cir. 1971). Neither the Federal Rules of Appellate Procedure nor the Court Reporter's Act compel reversal here. Furthermore, Defendants have not demonstrated that these omissions are substantial or significant. Defendants' arguments fail.

### *O. Cumulative Reversal*

Defendants' final argument is that even if no individual error is reversible, the cumulative effect of the errors warrants reversal.

An appellate court may reverse a conviction by aggregating otherwise non–reversible errors that combine to deny the defendant's right to a fair trial. *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc).

Because we do not find that the district court made any errors, cumulative reversal is unavailable.

No. 18-40598

## III. CONCLUSION

For the aforementioned reasons, we AFFIRM the sentences and convictions of Ricky Fackrell and Christopher Cramer.