# SUPREME COURT OF THE UNITED STATES

## WESLEY PAUL COONCE, JR. *v.* UNITED STATES

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 19–7862.   Decided November 1, 2021

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, dissenting from the denial of certiorari.

Petitioner Wesley Paul Coonce, Jr., was convicted in federal court of murder.  Facing the death penalty, he argued that his execution would violate the Eighth Amendment because he has an intellectual disability.  See *Atkins* v. *Virginia*, 536 U. S. 304 (2002).  The District Court denied Coonce's *Atkins* claim without a hearing, the jury sentenced him to death, and the Eighth Circuit affirmed.

In denying Coonce relief without a hearing, the courts relied on the definition of intellectual disability by the American Association on Intellectual and Developmental Disabilities (AAIDD), which then required that an impairment manifest before age 18.  It is undisputed that Coonce's impairments fully manifested at age 20.  After Coonce petitioned for certiorari, the AAIDD changed its definition to include impairments that, like Coonce's, manifested before age 22.

The Government urges us to grant certiorari, vacate the judgment below, and remand (GVR), conceding that it is reasonably probable that the Eighth Circuit would reach a different result on reconsideration given the significant shift in the definition that formed the basis of its opinion.  Instead, the Court denies certiorari.  Because Coonce is entitled to a hearing on his *Atkins* claim, and because our precedents counsel in favor of a GVR, I respectfully dissent.

SOTOMAYOR, J., dissenting

# I

## A

Coonce's childhood was marked by emotional, physical, and sexual abuse. He cycled through child psychiatric institutions beginning at age four. He entered the Texas juvenile system at age 11. While in juvenile custody, he cut his own body and had to be restrained so he would not further harm himself. He was sentenced to adult prison at age 17, where he continued to engage in self-mutilation.

At age 20, after Coonce's release from state prison, he suffered a traumatic brain injury. Coonce broke multiple facial bones, experienced bleeding around the brain, and briefly entered a coma. His IQ plummeted from average into the range of intellectual disability.

At age 29, while in federal prison serving a life sentence for kidnapping and carjacking, Coonce and his codefendant, Charles Michael Hall, attacked and killed Victor Castro Rodriguez, another prisoner. Hall was a decade older than Coonce, with an IQ about 30 points higher. It was Hall who bound, gagged, and blindfolded Castro. Hall consistently asserted that he had killed Castro by standing on his neck and suffocating him. Coonce, however, immediately claimed responsibility for the killing.

## B

A jury convicted Coonce of first-degree murder and murder by a federal prisoner serving a life sentence. See 18 U. S. C. §§1111, 1118. After a penalty-phase hearing, the jury recommended death.[1] 932 F. 3d 623, 631 (CA8 2019).

Before trial, the defense represented that Coonce would

_____

[1] The jury unanimously found as a mitigating factor that Coonce's childhood "'was marked by chaos, abuse (both physical and sexual), as well as neglect and abandonment.'" 932 F. 3d, at 632. Eight jurors also found that Coonce "'ha[d] suffered from mental and emotional impairments from a very young age.'" *Ibid.*

not be raising a claim of intellectual disability. *Ibid.* However, on May 27, 2014, in the midst of the penalty-phase proceedings, this Court held that a "rigid rule" disqualifying a defendant from establishing intellectual disability if the defendant "scored a 71 instead of 70 on an IQ test" was unconstitutional. *Hall* v. *Florida*, 572 U. S. 701, 724. The next day, Coonce moved for relief under *Atkins*. He noted that he had scored a 71 on a reliable IQ test and argued that a rigid age-18 onset cutoff, like the 70-IQ cutoff in *Hall*, was unconstitutional.

The District Court denied the motion without a hearing. 932 F. 3d, at 633, 634. The Eighth Circuit affirmed. *Id.*, at 634. When considering Coonce's Eighth Amendment claim, the court acknowledged that "the [American Psychiatric Association (APA)] has recently changed its definition for the age of onset from before eighteen to 'during the developmental period,' defined as 'during childhood or adolescence.'" *Ibid.* And, it added, Coonce "tells us about literature suggesting the AAIDD, which still defines the age of onset as before eighteen, will eventually shift to a more vague standard." *Ibid.* The court rejected such "predictions" as "not sufficient for us to divine any current Eighth Amendment limitation." *Ibid.*

Coonce timely petitioned for certiorari. While his petition was pending, the AAIDD issued a new edition of its leading manual on intellectual disability. The manual included a revised definition of intellectual disability, which requires that a disability "originat[e] during the developmental period, which is defined operationally as before the individual attains age 22." AAIDD, Intellectual Disability: Definition, Diagnosis, Classification, and Systems of Supports 1 (12th ed. 2021) (AAIDD Manual). Coonce filed a supplemental petition requesting that the Court GVR so the Eighth Circuit could reconsider his *Atkins* claim in light of this new development.

The Government agreed. "This Court should GVR," it explained, "because the AAIDD's intervening definitional revision affects a central factual predicate for the court of appeals' Eighth Amendment analysis." Brief in Opposition 12. It conceded that "below, [it] invoked the AAIDD's and APA's 'leading publications' on intellectual disability" to argue for an age-18-onset standard; that the Eighth Circuit "likewise relied on" those standards; and that the change in the AAIDD's definition "affect[ed] a central factual predicate for the court of appeals' Eighth Amendment analysis." *Id.*, at 12, 14. "A GVR order is particularly warranted," the Government emphasized, "given the stakes in this capital context." *Id.*, at 15.

Nevertheless, the Court denies certiorari.

II

The Court's refusal to GVR is deeply concerning, especially given the strength of Coonce's claim. In context, the change in the AAIDD's definition provides compelling evidence of a shift in consensus in Coonce's favor with respect to the age of onset requirement. If he satisfies that requirement, he likely could establish an intellectual disability under *Atkins*.

A

"The Eighth Amendment prohibits certain punishments as a categorical matter." *Hall*, 572 U. S., at 708. "[A]s relevant for this case, persons with intellectual disability may not be executed." *Ibid.* "[T]he medical community defines intellectual disability according to three criteria: [1] significantly subaverage intellectual functioning, [2] deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and [3] onset of these deficits during the developmental period." *Id.*, at 710. The Government does not dispute that Coonce has of-

fered enough evidence on the first two prongs of this definition to merit an *Atkins* hearing. With respect to the third prong, however, the courts below held that Coonce categorically could not prove intellectual disability because the Eighth Amendment required onset prior to age 18. Coonce, by contrast, argued that his age-20 onset may accord with the definition of intellectual disability.

Since the decision below, the consensus in support of Coonce's position has only grown. The AAIDD's change in definition offers powerful evidence of this shift.

As this Court demonstrated in *Hall*, the analysis begins by "consult[ing] the medical community's opinions." 572 U. S., at 710. "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.,* at 721; see also *Moore* v. *Texas*, 581 U. S. ___, ___ (2017) (slip op., at 10) (emphasizing that our precedent does not "license disregard of current medical standards"). As noted, the AAIDD (relied upon in *Hall*) now has replaced its prior age-18 onset requirement with an age-22 onset requirement, evincing a clear shift. AAIDD Manual 1.[2] Similarly, the APA's Diagnostic and Statistical Manual of Mental Disorders (DSM) used to require an impairment to onset "'before age 18 years'" to meet the definition of an intellectual disability. *Atkins*, 536 U. S., at 308, n. 3 (quoting DSM–IV, p. 41 (4th ed. 2000)). However, in 2013, the manual's fifth edition (DSM–5) changed course, providing only that an impairment must onset "during the developmental period." *Hall*, 572 U. S., at 721 (citing DSM–5, at 33). The revisions to the AAIDD and APA definitions have aligned those definitions more closely with that of the American Psychological Association, another authority relied upon in *Hall*,

_____

[2] This Court held in *Moore* that a state court on collateral review reversibly erred when it disregarded the AAIDD's definition of intellectual disability in favor of wholly nonclinical factors. 581 U. S., at ___.

which also sets the cutoff at age 22. Manual of Diagnosis and Professional Practice in Mental Retardation 13, 36 (1996). These three leading clinical pronouncements provide powerful evidence of medical consensus that cannot be disregarded. *Moore*, 581 U. S., at ___.

"[T]he legislative policies of various States" in defining intellectual disability are also central to the inquiry. *Hall*, 572 U. S., at 710. By my count, here, as in *Hall*, "in 41 States an individual in [Coonce's] position . . . would not be deemed automatically eligible for the death penalty." *Id.,* at 716.[3] Moreover, this aggregate number is "not the only

_____

[3] As follows, 41 States appear to eschew a rigid age-18 onset requirement. Two States impose no age-of-onset requirement in the *Atkins* context. Neb. Rev. Stat. §28–105.01(3) (Cum. Supp. 2014); Kan. Stat. §§21–6622(h), 76–12b01(d) (Cum. Supp. 2018); see *State* v. *Vela*, 279 Neb. 94, 151, 777 N. W. 2d 266, 307 (2010) (discussing Nebraska Legislature's choice to omit age-of-onset requirement). Two impose an age-22 onset requirement. See Ind. Code §35–36–9–2 (2021); Utah Code §77–15a–102(2) (2021). A fifth State, the Nation's most populous, recently amended its law to replace its rigid age-18 onset requirement with "the developmental period, as defined by clinical standards." Cal. Penal Code Ann. §1376(a)(1) (West Cum. Supp. 2021). A sixth dropped its rigid age-18 onset requirement in 2014. Compare La. Code Crim. Proc. Ann., Art. 905.5.1(H) (West 2014) (requiring onset "before the age of eighteen years") with La. Code Crim. Proc. Ann., Art. 905.5.1(H) (West Cum. Supp. 2021) (requiring onset "during the developmental period"). Three more States (totaling 9) similarly impose no rigid age-of-onset cutoff and require onset "during the developmental period," indicating flexibility and suggesting incorporation of the medical consensus. Ga. Code Ann. §17–7–131(a)(2) (2020); Ky. Rev. Stat. Ann. §532.130(2) (West 2016); S. C. Code Ann. §16–3–20(C)(b)(10) (2015); see also *Woodall* v. *Commonwealth*, 563 S. W. 3d 1, 7 (Ky. 2018) (emphasizing that in Kentucky, "prevailing medical standards should always take precedence in a court's determination"). Two more, Montana and Wyoming (totaling 11), have not adopted any rigid definition of intellectual disability in the criminal context. Twenty-three additional States (totaling 34) have abolished the death penalty, as has the District of Columbia. See *Roper* v. *Simmons*, 543 U. S. 551, 574 (2005) (teaching that States that have abandoned capital punishment should be considered as part of the consensus against

consideratio[n] bearing on a determination of consensus,"
*id.,* at 717; the "[c]onsistency of the direction of change,"
*ibid.*, also supports Coonce's position. In the last five years,
five States (Colorado, Delaware, New Hampshire, Virginia,
and Washington) have abolished the death penalty, and a

———————

its application). Two more States (totaling 36), Oregon and Pennsylvania, have suspended executions. See *Hall*, 572 U. S., at 716 (counting "Oregon, which has suspended the death penalty," as part of consensus against rigid 70-IQ rule).

Four States' courts of last resort have mentioned an age-18 onset requirement in the *Atkins* context, but relied on at least one medical definition that subsequently has changed. *State* v. *Ford*, 158 Ohio St. 3d 139, 146–148, 2019-Ohio-4539, 140 N. E. 3d 616, 647 (relying on AAIDD and APA standards in effect at the time); *Ex parte Lane*, 286 So. 3d 61, 63 (Ala. 2018) (same); *Chase* v. *State*, 171 So. 3d 463, 470 (Miss. 2015) (same); *Ex parte Briseno*, 135 S. W. 3d 1, 7 (Tex. Crim. App. 2004) (same), abrogated in part by *Moore*, 581 U. S., at ___. In addition, Nevada's highest court has defined the state legislature's flexible age-of-onset requirement ("during the developmental period," Nev. Rev. Stat. §174.098(7) (2017)) to require age-18 onset, again relying on AAIDD and APA definitions that are now outdated. *Ybarra* v. *State*, 127 Nev. 47, 53–54, 57–58, 247 P. 3d 269, 273–274, 276 (2011). Because these courts have defined intellectual disability for capital cases in direct reference to the medical consensus, it is far from clear that Coonce would be denied an *Atkins* hearing in these five States (totaling 41) solely because his impairments fully manifested at age 20. See *Moore*, 581 U. S., at ___, ___ (slip op., at 8, 17) (holding that "adherence to superseded medical standards," as opposed to reliance on "current manuals [which] offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians," violated the Eighth Amendment (internal quotation marks omitted)).

Only nine States with capital punishment have adopted a statutory age-18 onset requirement for *Atkins* claims. See Ariz. Rev. Stat. Ann. §13–753(K)(3) (2020); Ark. Code Ann. §5–4–618(a)(1)(A) (Supp. 2021); Fla. Stat. §921.137(1) (2015); Idaho Code Ann. §19–2515A(1)(a) (2017); Mo. Rev. Stat. §565.030(6) (2016); N. C. Gen. Stat. Ann. §15A–2005(a)(1) (2019); Okla. Stat., Tit. 21, §701.10b(B) (Supp. 2020); S. D. Codified Laws §23A–27A–26.1 (Cum. Supp. 2019); Tenn. Code Ann. §39–13–203(a)(3) (Supp. 2021). There is no reason to assume that on reconsideration, the Eighth Circuit would necessarily side with this minority of jurisdictions.

sixth (California) recently repealed its rigid age-18 onset re-
quirement and replaced it with "clinical standards." Cal.
Penal Code Ann. §1376(a)(1) (effective Jan. 1, 2021). Three
of these States (California, Colorado, and Virginia) enacted
these reforms just during the pendency of Coonce's petition
for certiorari.

On the whole, there is "strong evidence of consensus that
our society does not regard this strict cutoff as proper or
humane." *Hall*, 572 U. S., at 718. As the Government con-
cedes, with the new information, there is at least "a reason-
able probability" the Eighth Circuit would conclude that
Coonce has demonstrated timely onset of his impairments.
Brief in Opposition 13 (internal quotation marks omitted).

B

The Government also tells us that a redetermination by
the Eighth Circuit "may determine the ultimate outcome"
of Coonce's *Atkins* claim. Brief in Opposition 13 (internal
quotation marks omitted). Indeed, even without a hearing,
Coonce has produced convincing evidence on the first two
prongs of intellectual disability. A defense psychologist
who reviewed documentary evidence and administered a
comprehensive battery of tests on Coonce across two 4-hour
sessions determined that he had an IQ of 71, within the ac-
cepted range for intellectual disability. See *Moore*, 581
U. S., at ___ (IQ score of 74, accounting for standard error,
required consideration of adaptive functioning); *Brumfield*
v. *Cain*, 576 U. S. 305, 315 (2015) (state court unreasonably
applied *Hall* in finding IQ score of 75 to preclude intellec-
tual disability); *Hall*, 572 U. S., at 712–714 (if IQ score is
close to 70, courts must account for "standard error of meas-
urement"). Coonce therefore has put forth evidence to es-
tablish that he has "significantly subaverage intellectual
functioning." *Id.*, at 710.

The remaining prong, deficits in adaptive functioning,

"requires an evaluation of the individual's ability to function across a variety of dimensions." *Brumfield*, 576 U. S., at 317. A defense expert's evaluation of Coonce identified significant impairments in memory, language, attention, reasoning, ability to organize information, and executive functioning. There is also evidence that Coonce was unable to hold employment, control his impulses, and function independently. Even in the regimented environment of prison, Coonce's attorneys represent that he continues to engage in self-mutilation, has proven unable to timely take medication, and cannot complete other basic tasks.[4]

In sum, if Coonce satisfies the age-of-onset requirement, he has a substantial likelihood of proving he has an intellectual disability.

## III

In light of the above, the material change in the AAIDD's leading definition of intellectual disability plainly warrants a GVR. To my knowledge, the Court has never before denied a GVR in a capital case where both parties have requested it, let alone where a new development has cast the decision below into such doubt.

The Court has held that "[w]here intervening developments . . . reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and

———————

[4] That some "other evidence in the record . . . cut[s] against [Coonce's] claim" is no justification for denying a hearing, *Brumfield* v. *Cain*, 576 U. S. 305, 320 (2015), especially where that evidence was less than compelling. For example, a psychologist estimated Coonce's IQ at around 79 after his accident, while a Bureau of Prisons psychologist later estimated his IQ at around 77. However, neither of these estimates used tests designed to measure IQ. In contrast, the expert witness who calculated Coonce's IQ at 71 did so using the leading clinical instrument for conducting such testing. Even the Government's expert conceded that the defense expert's IQ testing was conducted properly and that there was no evidence of malingering.

where it appears that such a redetermination may determine the ultimate outcome of the litigation, a GVR order is . . . potentially appropriate." *Lords Landing Village Condominium Council of Unit Owners* v. *Continental Ins. Co.*, 520 U. S. 893, 896 (1997) (*per curiam*) (internal quotation marks omitted). The Government appropriately confesses that "[t]his case satisfies both criteria" and that, as a result, "[t]his Court should GVR." Brief in Opposition 12, 14.

Members of this Court have expressed additional views on the propriety of GVR orders.[5] Under any, a GVR was appropriate here. The parties have identified a new development with obvious legal bearing. The AAIDD definition was one of only two sources the Eighth Circuit consulted, and the court rejected Coonce's argument solely because, at the time, it was an unrealized "predictio[n] that medical experts will agree with Coonce's view in the future." 932 F. 3d, at 634. As the Government concedes, the realization of Coonce's "predictio[n]" surely presents a reasonable probability of a different outcome. Thus, the Government does not defend the judgment below.

Finally, in the Government's words, "[a] GVR order is

———————

[5] See, *e.g., Myers* v. *United States*, 587 U. S. ___, ___ (2019) (ROBERTS, C. J., dissenting) (slip op., at 2) (GVR unwarranted "[u]nless there is some new development to consider"); *Hicks* v. *United States*, 582 U. S. ___, ___ (2017) (GORSUCH, J., concurring) (slip op., at 2) (in cases involving unpreserved but plain errors, GVR appropriate "where we think there's a reasonable probability" that "curing the error will yield a different outcome"); *Stutson* v. *United States*, 516 U. S. 193, 198 (1996) (Scalia, J., dissenting with *Lawrence* v. *Chater*, 516 U. S. 163, 178, 191–192 (1996)) (GVR warranted "where an intervening factor has arisen that has a legal bearing upon the decision").

In *Myers*, unlike here, the Government endorsed the judgment below and requested GVR only because the lower court "made some mistakes in its legal analysis." 587 U. S., at ___ (slip op., at 1). *Hicks*, too, did not involve any new development. Rather, the Government sought to resuscitate a claim that the defendant had forfeited. 582 U. S., at ___ (ROBERTS, C. J., dissenting).

particularly warranted given the stakes in this capital con-
text." Brief in Opposition 15. Coonce asserts an interest of
constitutional dimension. He requests a meaningful oppor-
tunity to be heard on his claim that he has an intellectual
disability, such that his execution would "violat[e] his . . .
inherent dignity as a human being," threaten "the integrity
of the trial process," and contravene the Eighth Amend-
ment's prohibition on cruel and unusual punishment. *Hall*,
572 U. S., at 708, 709. The Court has issued GVR orders
for far less.

This Court has long emphasized the "need for reliability
in the determination that death is the appropriate punish-
ment in a specific case." *Woodson* v. *North Carolina*, 428
U. S. 280, 305 (1976) (plurality opinion). A GVR was the
least the Court could have done to protect this life-or-death
interest.

*         *         *

I can only hope that the lower courts on collateral review
will give Coonce the consideration that the Constitution de-
mands. But this Court, too, has an obligation to protect our
Constitution's mandates. It falls short of fulfilling that ob-
ligation today. The Court should have allowed the Eighth
Circuit to reconsider Coonce's compelling claim of intellec-
tual disability, as both he and the Government requested.
I respectfully dissent.